STATE ex inf. Robert L. FUCHS, Special
Prosecuting Attorney, Respondent,

v.

Homer L. FOOTE, Jr., Sheriff, Appellant.

No. 77329.

Supreme Court of Missouri,
En Banc.

July 25, 1995.

■■■■■■■■■■■■■■■■■■■■■■■■

Joseph Y. DeCuyper, Kansas City, for appellant.

Tom Kretsinger, Jr., Tim Finnical, Liberty, for respondent.

LIMBAUGH, Justice.

This is an appeal by respondent, Homer L. Foote, Jr., from a judgment of the circuit court ousting him from the office of Sheriff of Cass County. At the time of the proceedings, Foote was in his third term of office, having first been elected in 1984, and reelected in 1988 and 1992. The judgment was entered after trial on a petition for quo warranto filed by relator, Robert L. Fuchs, a special prosecutor for Cass County. The petition alleged and the trial court found that Foote committed several acts of misconduct, either personally or at his direction or with his knowledge. Jurisdiction is based on Article V, § 3, of the Missouri Constitution. The judgment of the circuit court is affirmed.

I.

As a preliminary matter, Foote contests the appointment of Fuchs and two other special prosecutors, Tim Finnical and Tom Kretsinger, Jr. This issue first arose in August 1992, when Dennis Laster, the duly elected Cass County prosecutor, applied for the appointment of a special prosecutor to investigate, and, if warranted, to initiate quo warranto proceedings against Foote. Laster based the application on his expectation to testify as a witness to Foote's misconduct. The presiding judge sustained the application and initially appointed Finnical as the sole special prosecutor. Upon Finnical's subsequent applications, the judge appointed Kretsinger and Fuchs as additional special prosecutors to assist Finnical.

Foote contends that Laster's application did not comply with § 56.110, RSMo 1994, that sets out the statutory grounds for disqualification of a prosecutor. These grounds, that Foote tacitly assumes are exclusive, apply when the prosecutor is "interested or shall have been employed as counsel in any

case where such employment is inconsistent with the duties of his office, or shall be related to the defendant in any criminal prosecution, either by blood or by marriage...." § 56.110.

■■■ Although Foote is correct that none of the statutory grounds were listed in the application, Laster was nonetheless required to disqualify himself, and the appointments were nonetheless authorized by law. Rule 3.7 of the Rules of Professional Conduct provides, subject to exceptions not pertinent to this case, that "A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness...." Given this well-known admonition, Laster not only was disqualified from service, but was obligated to apply for a special prosecutor. *State v. Hayes,* 473 S.W.2d 688, 691–92 (Mo. 1971). Furthermore, the power to appoint a special prosecutor to replace Laster is not limited by § 56.110 or any other statute. It is, instead, a long-standing power inherent in the court, to be exercised in the court's sound discretion, when for any reason, the regular prosecutor is disqualified. *State v. Jones,* 306 Mo. 437, 268 S.W. 83 (1924); *State v. Sweeney,* 93 Mo. 38, 5 S.W. 614, 615 (1887).

■■■ Foote also contends that the appointment of the two additional assistant special prosecutors was not permitted under § 56.110. The statute, however, does not address this contention one way or the other. Even if it did, the propriety of the appointments in this case does not turn on § 56.110, but rather on the trial court's inherent power. In making these appointments, the trial judge relied on the assertions of Finnical, the first prosecutor appointed, that he needed assistance due to the time constraints of his regular job and the complexity of the issues. These were reasons sufficient to support the court's exercise of its discretion.

■■■ Finally, Foote claims that § 56.110 authorizes the appointment of special prosecutors only in criminal cases, not in civil cases such as the quo warranto proceeding at hand. As stated, however, the appointments were not based on § 56.110, but on the trial court's inherent power. Because the prosecution of a civil action in the nature of quo

warranto is a proper function of prosecuting attorneys, Rule 98.02(b)(2), we find no reason to disallow the appointment of special prosecutors for that purpose.

## II.

The removal of certain public officials, and county sheriffs in particular, is governed by § 106.220, RSMo 1994, that provides:

Any person elected or appointed to any county, city, town or township office in this state, except such offices as may be subject to removal by impeachment, who shall fail personally to devote his time to the performance of the duties of such office, or who shall be guilty of any willful or fraudulent violation or neglect of any official duty, or who shall knowingly or willfully fail or refuse to do or perform any official act or duty which by law it is his duty to do or perform with respect to the execution or enforcement of the criminal laws of the state, shall thereby forfeit his office, and may be removed therefrom in the manner provided in sections 106.230 to 106.290.

The petition for quo warranto alleged both "willful or fraudulent violations" of official duties and "willful neglect" of official duties. None of the allegations, however, pertain to the failure to devote time to the performance of the duties of office or the failure to execute and enforce the criminal laws of the state.

Initially, we note that the misconduct must be related to an official duty. While the conviction of a crime is not a prerequisite to a judgment of ouster, *State ex inf. McKittrick v. Wymore*, 343 Mo. 98, 119 S.W.2d 941, 944 (1938), conduct unrelated to an official duty, although criminal in nature, is not sufficient to authorize a judgment in ouster. *Id.* The term "official duty," however, has no statutory definition. Obviously, it pertains to the duties of the office and includes those duties specifically set out in the several statutes relating to sheriffs and law enforcement officers generally. As this Court stated in *State ex inf. McKittrick v. Wymore*, 345 Mo. 169, 132 S.W.2d 979, 987 (1939) (quoting 46 C.J. Sec. 301, p. 1035), the duties of a public office also include those [duties] lying fairly within its scope, those essential to the accomplishment of the main purpose for which the office was created, and those which, although incidental and collateral, serve to promote the accomplishment of the principal purposes.

The mere violation of an official duty, however, will not support a judgment of ouster. The statute instead requires that the misconduct be the "willful or fraudulent violation" or "willful neglect" of the official duty at issue. Neither the legislature nor the courts have defined the terms "willful or fraudulent violation" or "willful neglect" as used in this statute. That the term "willful or fraudulent violation" is separately stated, indicates that it is something different than the term "willful neglect." Our cases, without defining the terms, have at least recognized that difference. *See e.g. State ex inf. Ashcroft v. Riley*, 590 S.W.2d 903, 906 (Mo. banc 1979) (sheriff who misrepresented costs of food preparation for inmates to county court and pocketed the difference held guilty of *willful violation* of official duty); *State ex inf. Eagleton v. Elliott*, 380 S.W.2d 929, 939 (Mo. banc 1964) (sheriff who placed or had placed stolen billfold in suspect's car for purposes of wrongfully implicating suspect held guilty of *willful violation* of official duty). *Compare State ex inf. McKittrick v. Williams*, 346 Mo. 1003, 144 S.W.2d 98, 105 (Mo. banc 1940) (sheriff who failed to enforce liquor, vice, and gaming laws held guilty of *neglect* of official duty). In our view, "willful or fraudulent violation" is a stronger term than "willful neglect" and connotes more than just nonfeasance or misfeasance. Rather, it is malfeasance, that is, misconduct in the performance of official duties.

"Willful neglect," on the other hand, is a hybrid between conduct that is wholly willful and conduct that is wholly neglectful. It is something more than mere mistake or the thoughtless failure to act. Neglect pertains to nonfeasance, the failure to act, whereas willfulness refers to intentional or self-determined conduct. Implicit in the idea of willfulness is the actor's knowledge of the duty neglected; one cannot intentionally neglect a duty without knowing that the duty exists. We conclude, therefore, that a public

official "willfully neglects" an official duty when he or she intentionally fails to act, contrary to a known duty. *See Hewitt Well Drilling & Pump Service, Inc. v. Director of Rev.*, 847 S.W.2d 795, 799 (Mo. banc 1993).

With these principles and definitions in mind, we consider the merits of the case.

## III.

█ The allegations of misconduct charged in the petition include: 1) unlawful detention of certain prisoners; 2) fabrication of documents for use in civil rights case; 3) misrepresentations in the purchase of vehicles; 4) fabrication of detention records; 5) unlawful strip searches of prisoners; 6) failure to train detention officers and the hiring of noncertified officers; 7) unauthorized use of tax exemption letter; 8) unauthorized use of NCIC computer; 9) noncompliance with bonding requirement; 10) failure to discipline an officer who fabricated an alcohol influence report; 11) harassment of employees; 12) failure to discipline an officer who converted Cass County property to his private use; and 13) failure to discipline an officer who fabricated evidence in a murder investigation. The trial court found that all of the allegations of misconduct were true and concluded that the misconduct constituted the willful violation and/or neglect of his official duties. On appeal, we will defer to the trial court's findings of fact and affirm the judgment unless there is no substantial evidence to support it, or unless the trial court erroneously declared the law or erroneously applied the law. *Brawley v. McNary*, 811 S.W.2d 362, 365 (Mo. banc 1991).

█ Having carefully reviewed the record, we focus only on the first three allegations, as they are the most grievous, and are best supported by the evidence and the law. Moreover, each of these allegations independently justifies the ouster.

## A. Unlawful Detentions

Under § 544.170, RSMo 1994 and Rules 22.06 and 21.11, no person may be detained in jail longer than 20 hours without an arrest warrant. Despite these provisions, between February 1991 and November 1993, Cass County detention officers serving under Sheriff Foote incarcerated some twenty-one individuals for periods that varied from one to seventeen days, even though no arrest warrants were ever issued. Although these individuals were held for misdemeanor offenses and ordinance violations including driving while intoxicated, driving while suspended and careless and imprudent driving, no formal charges were ever filed. At least eight of these incarcerations occurred after January 3, 1993, when Sheriff Foote began his third term of office.[1]

It is undisputed that the detention officers repeatedly violated the "20–hour rule" and that compliance with that rule is an "official duty." The dispute centers, instead, on Foote's claim that his conduct was not "willful." Foote states, in this respect, that he and his officers held a "good-faith" but mistaken belief that the detentions in question were lawful. We need not decide whether this claim is a viable defense under the law because we agree with the trial court's determination that the claim is not supported under the facts.

Foote bases his claim of "good faith" on the fact that a bond schedule pertaining to all traffic offenses was issued by the local judge assigned to hear those cases. The bond schedule, he contends, appeared to require all persons incarcerated for traffic offenses to post bond before they could be released, even if no warrant was ever issued. In fact, the bond schedule did not contravene the 20–hour rule.

The record discloses two key points that make suspect Foote's claim of good-faith reliance on the bond schedule and support the trial court's finding that Foote knew all along that the detentions were unlawful: First, Foote admitted that he knew persons charged with *felonies* could not be incarcerated without a warrant for more than 20 hours. As the trial court aptly stated, "It strains credulity beyond reason to believe that any

---

1. It is arguable that misconduct during Foote's earlier term of office cannot be the basis for ouster in his last term. We need not address that issue because we review, in this point and the other two, only the misconduct that occurred during the last term.

law enforcement officer could believe that a person imprisoned on a traffic ticket could be held in jail when a person suspected of committing a serious offense could not." Second, and more damaging, is the Cass County "Blue Book," the sheriff's manual on operating procedures prepared at Sheriff Foote's direction. The "Blue Book" contains a section labeled "Arrest Without a Warrant—Felony *or Misdemeanor*" (emphasis added) that states: "[t]his department can only hold a person on a warrantless arrest for twenty (20) hours." Given this evidence, we uphold the trial court's finding of willful violations.

## B.  Fabrication of Documents For Use in Civil Rights Case

In 1993, Clinton Ardenall filed suit in federal court against Sheriff Foote and his deputy, John Strickland. The suit alleged violation of Ardenall's civil rights in connection with the repossession of his vehicle in 1990. Prior to trial, Ardenall's attorney filed a request for production of documents seeking, *inter alia,* copies of all training manuals and self-help repossession documents. The purpose of the request was to determine whether Sheriff Foote maintained a lawful replevin policy for his office. If so, Foote would likely be exonerated despite any misconduct on the part of his deputy. In response to the discovery request, Foote produced a copy of the "Blue Book," his manual on operating procedures.

The testimony at the ouster trial revealed that the "Blue Book" was originally prepared in 1985, and that it was subsequently revised and retyped in 1991 by Kathy Gattenby, the sheriff's secretary. In July 1993, after Ardenall's suit was filed, Foote handed Gattenby papers that set out an official office policy on replevin and instructed her to type the papers and insert them in the "Blue Book." When Gattenby noticed that the papers included the date 12–14–88 as the effective date of the policy, she informed Foote that she had been unaware of the policy at the time she revised and retyped the "Blue Book" in 1991. Nevertheless, after inserting the new policy with the effective date 12–14–88, Gattenby sent the "Blue Book," at

Foote's direction, to his attorney for production in the Ardenall case.

The nonexistence of the replevin policy was corroborated by additional testimony. Several officers stated that they were unaware of any replevin policy in the "Blue Book" in 1990. Another officer, Jim Lee, testified that in 1993, while the lawsuit was pending, Foote instructed him to print a replevin policy off his computer and to include in the policy an effective date of "6–17–85." Lee complied with the instruction despite the fact that the replevin policy could not have existed in the computer in 1985, or in 1990 when the Ardenall repossession occurred, because the computer was not purchased until 1991.

Based on this testimony, the trial court found that Foote intentionally falsified documents and provided those documents for use in a judicial proceeding and that he did so for the purpose of falsely representing the replevin policy of his office in 1990. This conduct, the court concluded, constituted the willful violation of his official duties. Although the court did not specify the official duty violated, Foote's participation in the lawsuit when sued in his official capacity is a duty fairly within the scope of his public office. His misconduct in the performance of that duty constitutes the willful violation of that duty.

Foote's sole defense to these allegations was to persuade the court that the replevin policy existed since 1985, but had inadvertently been left out of the policy manual. This claim, even if true, does not excuse Foote's conduct because he was still required to submit the policy manual as it existed in 1990. In any event, there is ample evidence in the record to support the trial court's disbelief of Foote's account of the matter and to support the finding that Foote willfully violated his official duties.

## C.  Misrepresentations in the Purchase of Vehicles

In April 1993, the Cass County Commission authorized Sheriff Foote to purchase five new patrol vehicles from Metro Ford in Kansas City. Metro Ford's supplier agreed to produce a limited number of "police-

equipped" vehicles for sale to government agencies at a price substantially less than retail. The supplier also set a cutoff date of April 25 beyond which no units would be produced. In order to circumvent the cutoff date and obtain more of these specially-priced vehicles than the rightful allotment, Larry Reynolds, Metro Ford's fleet manager, persuaded Sheriff Foote to place an order for twelve vehicles with the understanding that Foote would take delivery on only five.

Sheriff Foote, who states he was merely doing a favor for a friend, prepared an order for 12 vehicles on his official Cass County stationery and faxed it to Metro Ford on April 29. To accommodate the April 25 cutoff, he backdated the order to April 9.

This account of the sheriff's conduct, taken from the trial court's findings, is uncontroverted except for the sheriff's bare assertion that he "never devised any scheme to defraud anyone of anything." Giving no credence to Foote's position, the trial court entered this finding: "He, by his conduct, demonstrates that the truth is a concept to be recognized if it suits his protected purpose, and observance of it, otherwise, may be casually disregarded as an annoyance, if it conflicts with his will."

We hold that the findings are supported by the record and justify the conclusion that Foote willfully violated his official duties. The authorized purchase of patrol vehicles is undeniably a duty of the sheriff that is fairly within the scope of his office, and is therefore an "official duty." Sheriff Foote's complicity with Larry Reynolds to defraud Metro Ford's supplier is misconduct in the performance of that duty and therefore constitutes the willful violation of that duty.

## IV.

For the reasons stated herein, the judgment of the trial court ousting Sheriff Homer L. Foote, Jr. from the office of Sheriff of Cass County is affirmed.

All concur.