**STATE of Missouri, ex inf. Jeremiah W. NIXON, Attorney General of the State of Missouri, Respondent,**

v.

**Thomas RUSSELL, Sheriff of Miller County, Missouri, Appellant.**

No. WD 58980.

Missouri Court of Appeals, Western District.

April 10, 2001.

Bruce H. Truesdale, Jefferson City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for respondent.

Before BRECKENRIDGE, P.J., ULRICH and HOWARD, JJ.

BRECKENRIDGE, Judge.

Thomas Russell appeals from the judgment of the trial court sustaining the State's petition in *quo warranto* ousting him from the office of sheriff of Miller County. The trial court based its decision on numerous acts of misconduct committed either by Mr. Russell personally or by those for whom he was responsible. On appeal, Mr. Russell claims that the trial court erred in entering the judgment of ouster based upon the conduct of jailers and inmates. With respect to this point, he argues that sheriffs should be held liable for the acts of deputies only when those acts are performed in the line of the deputy's official duties and under color of office. He also contends that he cannot be held liable for the actions of third parties unless the violations of law have been open and notorious and he refused to act on known violations. The second basis for his appeal is his allegation that a willful violation or neglect of a known duty is required to support the ouster of an elected sheriff and the evidence showed that he had a good faith belief that he was acting within the scope of his authority. Finally, Mr. Russell contends that the judgment of ouster was not supported by the evidence because the personal gain realized by him was minimal when offset by his expenditures of personal funds and the use of his personal vehicle that benefited the county. Because this court finds that the evidence at trial was sufficient to support the trial

court's finding of a "willful ... neglect of any official duty" under § 106.220, RSMo 1994,[1] the judgment of the trial court is affirmed.

### Factual and Procedural Background

The judgment contains written findings of fact and conclusions of law on only some of the fact issues in this case. The record on appeal does not include transcripts of the pretrial conferences at which Mr. Russell apparently requested findings of fact and conclusions of law. From the record that was filed on appeal, however, it does not appear that Mr. Russell requested findings on specific issues of fact and, instead, made only a blanket request for findings of fact. This request was not sufficient to require the trial court to make findings of fact on every issue in the case. *Jefferson v. Bick,* 872 S.W.2d 115, 121 (Mo.App.1994). Therefore, this court may consider all evidence in the light most favorable to the judgment even if there is not a specific finding of fact on the issue. Rule 73.01(c). The facts set forth by this court have been limited, however, to the evidence supporting the specific instances of misconduct found by the trial court.

On December 24, 1996, Thomas Russell took the oath of office and became the sheriff of Miller County, Missouri. When Mr. Russell took office, he employed five jailers. At that time, the jail could hold no more than twelve inmates except in emergency situations. Female inmates were housed on the upper level and male inmates were housed on the lower level. In June 1998, the sheriff's department moved into a new jail and the number of inmates and employees increased.

Prior to the move into a new jail facility, Mr. Russell conducted a sheriff's auction to dispose of seized and unclaimed stolen property. Although he claims to have discussed the auction with several county officials, Mr. Russell did not obtain a court order to dispose of the property. At the sale, Mr. Russell's father purchased several guns, but was not required to pay the five-dollar-per-gun fee for gun permits. From the proceeds of the sheriff's auction, Mr. Russell paid himself and three employees fifty dollars each for work performed at the auction and also paid for his and the other employees' dinner that evening.[2]

At both the old and new jail, certain inmates were selected as trustees to perform tasks in the jail and on the jail grounds. As part of this privilege, trustees received their own cell and nearly unlimited freedoms, including free access to most all areas of the jail and the jail premises. The trustees were allowed to leave the confines of the jail without an escort. One such trustee, David Birdsong, was under few, if any, restrictions. He was permitted to leave the jail facility without reporting his whereabouts to anyone and was granted free access to the jail grounds. He also had visitation with his girlfriend on the grounds surrounding the jail without supervision.

In 1998, some inmates were allowed to leave the jail to attend the sheriff's barbecue at a local park. Mr. Birdsong attended the sheriff's barbecue and ran the

---

1. All statutory references are to the Revised Statutes of Missouri 1994, unless otherwise noted.

2. After the deposition of the presiding county commissioner was taken in this case and the commissioner expressed his belief that Mr. Russell's fifty dollar payment to himself and the payment for the meals were a violation of county policy, Mr. Russell reimbursed the county for both the fifty dollars and the amount of the meal. This occurred a year and a half after the auction took place.

dunking booth. Following the barbecue, Mr. Russell allowed Mr. Birdsong to leave the barbecue with a deputy sheriff, who was intoxicated, and spend the night at the apartment of the deputy's girlfriend instead of returning to jail. Mr. Birdsong returned to jail with the deputy the following morning. On one other occasion, Mr. Russell allowed Mr. Birdsong to leave the jail to attend his child's birthday party. On none of these occasions was there a court order or authorization for Mr. Birdsong's release.

As part of his duties as trustee, Mr. Birdsong washed the department vehicles and was allowed to drive the police vehicles, even though he had no valid driver's license. Mr. Birdsong was also found to have knives in his cell, but was not reprimanded except that the knives were confiscated. He was not relieved of his position as trustee.

During Mr. Birdsong's confinement, Mr. Birdsong also performed tasks at Mr. Russell's home and restaurant. During the summer of 1998, Mr. Birdsong mowed Mr. Russell's yard on numerous occasions. Mr. Birdsong helped Mr. Russell's office manager's husband lay carpet in a rental house on Mr. Russell's property. He also performed some work on Mr. Russell's car during the summer. In October 1998, Mr. Birdsong painted and waxed floors at Mr. Russell's restaurant.

At one point during the summer of 1998, Mr. Birdsong was released from custody by order of the court. Mr. Birdsong's release came on a Monday, and Mr. Russell hired him as a jailer to begin work on Friday. He was hired even though Mr. Russell knew that Mr. Birdsong was a convicted felon who had served time in the Department of Corrections before being transferred to the Miller County jail. Mr. Russell also knew that Mr. Birdsong had been incarcerated in the Miller County jail on two class A felonies for the sale of cocaine and that he pled guilty, pursuant to a plea bargain, to one count of sale and one count of possession. Under the plea bargain, Mr. Russell received a ten-year prison sentence that was suspended and a one-year sentence in the Miller County jail. At the time Mr. Russell hired Mr. Birdsong as a jailer, Mr. Birdsong had just been released from serving the full one-year sentence pursuant to a judicial parole. At this time, Mr. Russell also knew that Mr. Birdsong had outstanding warrants from the City of Eldon for driving while suspended and assault. Mr. Birdsong worked as a jailer for only twenty-two days before his parole was vacated because the visiting judge who entered it did not have jurisdiction over Mr. Birdsong's case. When his parole was vacated, Mr. Birdsong was re-incarcerated.

During Mr. Russell's term as sheriff, numerous instances of improper activity occurred in and around the jail. One such area of misconduct concerned sexual relations among jailers, inmates and visitors. Mr. Birdsong had sex with another inmate while incarcerated. Additionally, he had sex with his girlfriend on several occasions when she was visiting the jail. One of the jailers engaged in sexual relations with an inmate in exchange for allowing Mr. Birdsong to also engage in sexual relations. Another jailer sold conjugal visits, and yet another had a female inmate strip for him. Additionally, two jailers provided alcohol to some inmates and another sold cigarettes to inmates. Drug use by inmates also occurred during Mr. Russell's tenure.

Additionally, instances of warrants not being served occurred during Mr. Russell's term of office. Upon the direction of Mr. Russell, the felony warrant of an informant, Tammy Belk, was pulled from the computer so that she would continue to serve as an informant for the sheriff's

department. A deputy even engaged in sexual relations with the informant in exchange for not arresting her. As stated above, Mr. Russell ran a background check on Mr. Birdsong prior to hiring him as a jailer. Although the check indicated an outstanding warrant, Mr. Russell hired him as jailer and failed to execute the warrant. Mr. Russell was also aware of an outstanding warrant for Loretta Armstrong, the wife of a jailer. Instead of executing the warrant, Mr. Russell instructed the jailer to "take care" of his wife's warrant.

Around January 1999, the Missouri State Highway Patrol and the Missouri State Water Patrol began an investigation of the Miller County Sheriff's Department. All drug evidence was seized from the sheriff's evidence room and numerous items of evidence were found to be missing. On August 13, 1999, the State of Missouri filed a petition in *quo warranto* alleging that Mr. Russell, "acting individually and through Deputy Sheriffs and Jailers appointed by him, and under his supervision and control, for whom he is responsible, ha[d] engaged in willful and fraudulent violations of the laws of the State of Missouri and the United States, and ha[d] knowingly or willfully failed and refused to perform official acts and duties which by law it is his duty to do or perform with respect to the execution or enforcement of criminal laws of the State, and ha[d] engaged in willful acts of misconduct, malfeasance, misfeasance, and nonfeasance and oppression in office...."

On February 1, 2000, a trial was held. On February 3, 2000, the trial court issued its written findings of facts and conclusions of law in which it found six categories of misconduct by Mr. Russell as follows: (1) failure to separate prisoners by sex; (2) failure to serve warrants; (3) personal gain by sheriff; (4) commitment of prison-ers; (5) disposal of property contrary to law; and (6) contraband in jail. Specifically with respect to Mr. Russell's failure to separate prisoners by sex, the court found that jailers had accepted both sexual favors and money as a benefit for allowing conjugal visits and contraband in jail. With respect to Mr. Russell's failure to execute warrants, the court found that without cause he failed to arrest Tammy Belk, David Birdsong and Loretta Armstrong. The court found that Mr. Russell received personal gain by using prisoner labor to perform work at his home and restaurant. Additionally, the court found that Mr. Russell violated § 105.452 by waiving a fee for gun permits for a family member and for taking money from the proceeds of the sheriff's auction. Further, the court found that Mr. Russell had violated the orders of sentencing courts and § 544.470 by allowing an inmate to attend and work at the sheriff's barbecue, to stay at the home of a deputy overnight following the barbecue, and to leave the jail to attend a birthday party. Mr. Russell was also found to have violated § 542.301, RSMo Cum.Supp.1998, by disposing of unclaimed property without a court order. Finally, the court found that Mr. Russell violated § 221.111, RSMo Cum.Supp.1997, when jailers, for whose conduct he was responsible under § 221.020, provided beer for inmates. The court also noted that Mr. Russell admitted that during his term of office prisoners used drugs during their confinement. Because of these specific findings, the court determined that the conduct of Mr. Russell constituted "gross and willful neglect of a known duty that require[d] his ouster as Sheriff." This appeal follows.

### Standard of Review

"On appeal, [this court] will defer to the trial court's findings of fact and affirm the judgment unless there is no

substantial evidence to support it, or unless the trial court erroneously declared the law or erroneously applied the law." *State ex inf. Fuchs v. Foote*, 903 S.W.2d 535, 539 (Mo. banc 1995) (abrogated on other grounds by *State v. Olvera*, 969 S.W.2d 715 (Mo.banc.1998)).[3] The judgment should be set aside only when this court firmly believes that the judgment is wrong. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). In a court-tried civil action, the evidence, along with all reasonable inferences, are "viewed in the light most favorable to the trial court's judgment, and all contrary evidence and inferences must be disregarded." *Wildflower Community Association, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo.App.2000). "[T]he trial court, as the trier of fact, determines the credibility of witnesses and may believe or disbelieve all or a part of any witnesses' testimony." *Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 524 (Mo.App.1998).

## Standard for Ouster

In determining whether the findings of the trial court were sufficient to enter a judgment of ouster, this court must consider the statutory requirements for ouster of public officials. Section 106.220 governs the removal from office of certain elected officials, including sheriffs, and states as follows:

Any person elected or appointed to any county, city, town or township office in this state, except such officers as may be subject to removal by impeachment, who shall fail personally to devote his time to the performance of the duties of such office, or who shall be guilty of any willful or fraudulent violation or neglect of any official duty, or who shall knowingly or willfully fail or refuse to do or perform any official act or duty which by law it is his duty to do or perform with respect to the execution or enforcement of the criminal laws of the state, shall thereby forfeit his office, and may be removed therefrom in the manner provided in sections 106.230 to 106.290.

■■■ Under the statute, "[t]he mere violation of an official duty ... will not support a judgment of ouster." *Foote*, 903 S.W.2d at 538. The statute requires a " 'willful or fraudulent violation' or 'willful neglect' of the official duty at issue." *Id.* "Willful or fraudulent violation" has been defined by the Supreme Court as "malfeasance, that is, misconduct in the performance of official duties." *Id.* "Willful neglect ... is something more than mere mistake or the thoughtless failure to act." *Id.* It is an "intentional[ ] fail[ure] to act, contrary to a known duty." *Id.* at 539. When a sheriff commits an act of official misconduct, the result is "automatic forfeiture of his office." *State ex inf. Ashcroft v. Riley*, 590 S.W.2d 903, 907 (Mo. banc 1979). The court's role is simply to "establish[ ] ... the facts in a proper proceeding" and make a "judicial declaration of forfeiture." *Id.*

The statutes of Missouri set forth certain duties and responsibilities of county sheriffs. In addition to those duties specifically set out in the statutes, the Supreme Court has recognized that the "offi-

---

**3.** In *State v. Olvera*, 969 S.W.2d 715 (Mo. banc 1998), the Supreme Court held that its "exclusive appellate jurisdiction" was invoked in *quo warranto* actions only when title to a state office was at issue. Thus, the Court held that "[t]o the extent that *State ex inf. Fuchs v. Foote*, 903 S.W.2d 535 (Mo. banc 1995) [and other similar cases] impl[ied] that jurisdiction of an appeal in a *quo warranto* action is in [the Supreme Court], contrary to the opinion in this case, they should no longer be followed." *Olvera*, 969 S.W.2d at 716, n. 1. Therefore, *Olvera* provides the basis for this court's jurisdiction but does not affect the standards for ouster outlined in *Foote*, 903 S.W.2d at 538.

cial dut[ies]" of a sheriff encompass "those duties lying fairly within its scope, those essential to the accomplishment of the main purpose for which the office was created, and those which . . . serve to promote the accomplishment of the principal purposes." *Foote,* 903 S.W.2d at 538 (quoting *State v. ex inf. McKittrick v. Wymore,* 345 Mo. 169, 132 S.W.2d 979, 987 (banc 1939)) (addressing the term "official duty" in the ouster statutes).

As stated above, the trial court found that ouster was warranted based upon six areas of misconduct. Mr. Russell challenges the trial court's declaration and application of the law and claims that the evidence did not support that his actions were willful. He couches his points on appeal in terms of the proper standard to apply in ousting a sheriff and defenses available to the sheriff. First, he claims that the trial court erred in entering the judgment of ouster based upon the conduct of jailers and inmates. With respect to this point, Mr. Russell argues that sheriffs should be held liable for the acts of deputies only when those acts are performed in the line of the deputy's official duties and under color of office. He also contends that he cannot be held liable for the actions of third parties unless the violations of law have been open and notorious and he refused to act on known violations. The second basis for Mr. Russell's appeal is his allegation that a willful violation or neglect of a known duty is required to support the ouster of an elected sheriff and the evidence showed that he had a good faith belief that he was acting within the scope of his authority. Finally, Mr. Russell contends that the judgment of ouster was not supported by the evidence because the personal gain realized by him was minimal when offset by his expenditures of personal funds and use of his personal vehicle that benefited the county.

Based upon the standard of review, this court will address whether the trial court erroneously declared or applied the law in finding that Mr. Russell's actions constituted willful neglect warranting ouster. Having carefully reviewed the record and the findings of fact, it is unnecessary to consider all of the findings of misconduct and violations of duties. Specifically, this court will address the following: (1) whether Mr. Russell violated the orders of sentencing courts and his duty with respect to the commitment of prisoners in granting furloughs without a court order; (2) whether Mr. Russell realized personal gain from the office of sheriff by using inmate labor at his home and restaurant and by paying himself from the proceeds of the sheriff's auction; and (3) whether Mr. Russell violated applicable statutory provisions in disposing of seized and unclaimed property without a court order. Although the record reveals overwhelming evidence of misconduct and violations of the law in operating the jail and carrying out the duties of sheriff, the trial court did not address all the fact issues in its findings of fact and focused primarily on the admissions of Mr. Russell, which alone provide sufficient evidence that would warrant ouster based upon the standards outlined in the statute. Therefore, this court will consider the allegations or instances of misconduct upon which the trial court made more detailed findings of fact. Furthermore, even though the trial court found additional instances of misconduct not addressed by this court, it is not necessary that those be discussed individually as well. *See Foote,* 903 S.W.2d at 539. Each of the instances of misconduct addressed by this court independently justifies Mr. Russell's ouster from the office of sheriff. *See id.*

## Commitment of Prisoners

One of the specific acts of misconduct committed by Mr. Russell and established

by the court concerned the commitment of prisoners. The trial court found that Mr. Russell had violated the orders of sentencing courts and § 544.470, by allowing an inmate, Mr. Birdsong, to attend and work at the sheriff's barbecue, to stay at the home of the girlfriend of a deputy overnight following the barbecue, and to leave the jail to attend a birthday party.

Several statutes govern a sheriff's responsibility and duty with respect to the commitment of prisoners. Section 221.020 states that the sheriff of the county "ha[s] the custody, rule, keeping and charge of the jail within his county, and of all the prisoners in such jail[.]" Prior to the imposition of a sentence, § 544.470 provides that "[a] prisoner shall be committed to the jail of the county in which the same is to be tried, there to remain until he be discharged by due course of law." When a court imposes a sentence, which is to be served in the county jail, § 546.600 states that the sheriff, upon receiving a copy of the conviction, "shall execute the [sentence] accordingly."

 Nothing in these statutes permits a sheriff to allow an inmate to leave the confines of the jail at the sheriff's discretion. Likewise, Mr. Russell has provided

no basis upon which this power is granted to a sheriff. Absent a statutory basis or court order for permitting a prisoner's release, a sheriff is without authority to do so upon his own will.[4]

Interpreting a statute which imposed a similar obligation upon a sheriff, the court in *Baumgartner v. State*, 21 Md.App. 251, 319 A.2d 592, 600 (Md.1974) (citations omitted), stated that "unless the mittimus of the court is to the contrary . . . a sheriff has no discretion in releasing a prisoner 'unless some necessity makes it proper to remove him. . . .' Only a court order or a statute can relieve a sheriff of his responsibility to keep prisoners committed to his charge in *arcta et salva custodia,* strict and safe keeping—or . . . 'strict confinement under lock and key.' "[5] There, the sheriff challenged the trial court's instruction that the proper place of keeping prisoners was in jail. *Id.* at 598. In agreeing with the trial court's instruction, the court noted that "[e]ven at common law it was a misdemeanor for a sheriff or jailer having lawful custody of a prisoner voluntarily or negligently to permit him to depart from the custody, no matter how short a time the departure might be."[6] *Id.*

---

4. *An example of a statute permitting a prisoner's release is § 221.170, which establishes procedures by which prisoners in county jails may be granted the privilege of leaving the jail for employment and related matters. This statute does not place the decision to grant such leave to the sheriff, however.*

5. The statute in *Baumgartner*, 319 A.2d at 598, stated that "[t]he sheriff shall safely keep all persons committed to his custody by lawful authority until such persons are discharged by due course of law."

6. This common law principle has been codified and expanded by Missouri under § 575.240, which makes it a class D felony for a public servant to permit an escape:
 1. A public servant who is authorized and required by law to have charge of any per-

son charged with or convicted of any crime commits the crime of permitting escape if he knowingly:
(1) Suffers, allows or permits any deadly weapon or dangerous instrument, or anything adapted or designed for use in making an escape, to be introduced into or allowed to remain in any place of confinement, in violation of law, regulations or rules governing the operation of the place of confinement; or
(2) Suffers, allows or permits a person in custody or confinement to escape.
2. Permitting escape by suffering, allowing or permitting any deadly weapon or dangerous instrument to be introduced into a place of confinement is a class B felony; otherwise, permitting escape is a class D felony.

Likewise, the court in *Ex Parte Shores*, 195 F. 627, 628 (N.D.Ia.1912), addressed a contempt action against a sheriff who "[a]fter so receiving [a federal prisoner], instead of confining him in jail as commanded by the warrant, voluntarily and purposely permitted him to go from the jail and return thereto at pleasure, so that he was not in fact imprisoned as required by the sentence and order of imprisonment." The court in *Ex Parte Shores* stated the following:

> In cases where a person is committed to prison pursuant to his conviction of a prison offense, the jailer has no discretion (except in cases of emergencies) but to obey the warrant of commitment. He may not rightly consult his own convenience, nor that of the prisoner, and permit the latter to leave the jail and return thereto at pleasure. Persons are committed to jail for the purpose of imposing upon them the penalties they have incurred because of their violations of the law; and it is not for the jailer to remit any part of that punishment. If sickness or other circumstances should arise which make it proper to grant the prisoner some indulgences, the jailer must apply to the proper authorities for permission to grant the same.

*Id.* at 631.

■ In this case, it is undisputed that Mr. Russell allowed Mr. Birdsong to leave the confines of the jail. Mr. Russell admitted to such, conditioned only by his statement that he felt that he had the authority. The findings of the trial court focused on certain "releases" granted to Mr. Birdsong by Mr. Russell during which Mr. Birdsong was allowed to attend a sheriff's barbecue, stay at the home of a sheriff's deputy's girlfriend following the barbecue, and attend a birthday party away from the jail. While Mr. Russell asserts that Mr. Birdsong was in custody

while he was running the dunking booth at the sheriff's barbecue, there is evidence from which the trial court could have believed otherwise. In addition, Mr. Russell admits that he allowed Mr. Birdsong to leave the barbecue with a deputy and spend the night at the apartment of the deputy's girlfriend because the deputy wanted his girlfriend to cook a good breakfast for Mr. Birdsong the next morning. Mr. Russell acknowledged that the deputy had been drinking and, from Mr. Birdsong's testimony, the deputy was intoxicated. Finally, Mr. Russell admitted that Mr. Birdsong left the jail by himself to attend his daughter's birthday party. In allowing Mr. Birdsong to leave the jail for these purposes, and without proper escort or supervision, Mr. Russell violated court orders, the applicable statutes and common law principles.

Rather than challenging the findings of the court, Mr. Russell attempts to justify each of these actions by relying on a good-faith defense. Mr. Russell's good-faith defense to allowing Mr. Birdsong to attend the sheriff's barbecue is based upon his observations of prisoners working at other sheriff's department's barbecues. With respect to generally granting furloughs to prisoners, Mr. Russell claims that his belief that he could do so was based upon conversations with a prosecutor and a judge. Yet at trial, Mr. Russell did not identify the judge or prosecutor, or describe what the content of these alleged conversations were. There is no other testimony regarding these alleged conversations. At trial, Mr. Russell also asserted that he believed that he had authority to grant furloughs "under the statutes of Missouri." He never testified as to what specific statutes he believed gave him that authority. Finally, he admits that he made a "mistake" or "error" in judgment by allowing Mr. Birdsong to stay at the home of a deputy following the barbecue,

but this was not a willful violation of a duty and should not be the basis for ousting him from office. Mr. Russell's arguments are unpersuasive and not supported by evidence other than his own assertions. The trial court was free to disbelieve these assertions. *Ken Cucchi Const.,* 973 S.W.2d at 524.

Mr. Russell provides no authority to support his assertion that good faith is a defense to the ouster statute or to a finding of willful neglect. No Missouri court has applied such a defense in this context. When faced with a similar argument in *Foote,* 903 S.W.2d at 539, the Supreme Court declined to decide whether a good-faith defense was "a viable defense" in actions for ouster. There, the court agreed with the trial court's assessment that the claim of good faith was "not supported under the facts" and that the sheriff knew his actions were unlawful. *Id.*

In considering his argument that good faith is a defense to ouster, this court must consider the viability of such a defense in the context of this case. While the exact definition of "good faith" may vary depending on the context in which it is used, "in common usage [it] has a well-defined and generally understood meaning[.]" *State v. A.G.,* 670 S.W.2d 516, 517 (Mo. App.1984) (quoting *People v. Nunn,* 46 Cal.2d 460, 296 P.2d 813, 816 (Ca.1956)). That meaning is the "state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." *Id.* BLACK'S LAW DICTIONARY 701 (7th ed.1999), similarly defines "good faith," in part, as "honesty in belief or purpose" and "faithfulness to one's duty or obligation."

 Implicit in the trial court's finding of a willful neglect of a known duty is a rejection of Mr. Russell's assertion of good faith. As defined above, "willful neglect"

in the context of the ouster statute is an "intentional[ ] fail[ure] to act, contrary to a known duty." *Foote,* 903 S.W.2d at 539. The court's finding of "willful neglect" by Mr. Russell is inconsistent with the concept of "faithfulness to one's duty or obligation" in the definition of good faith. Having found that Mr. Russell's failure to act was "intentional" and contrary to a "known" duty, the trial court inherently rejected an assertion that he was "faithful" to his duty.

Furthermore, his reliance on the actions of others to justify his neglect of his duties has been expressly rejected by the Supreme Court. In another sheriff's ouster case, the Court in *Riley,* 590 S.W.2d at 907 (citations omitted), held that customs or practices that are contrary to the plain and unambiguous language of controlling statutes "must give way to the law." Under the statutes listed above, Mr. Russell clearly had charge over the prisoners of Miller County and had a duty to see that they were kept in the county jail until the time they were tried, and throughout the duration of their sentence. Even if other sheriffs were using inmates contrary to these statutes, that did not excuse Mr. Russell's actions. *See id.*

The statutes of Missouri define Mr. Russell's duties with respect to the confinement of prisoners, not the actions of other sheriffs. Mr. Russell and all other "[p]ersons are conclusively presumed to know the law." *Missouri Highway and Transp. Comm'n v. Myers,* 785 S.W.2d 70, 75 (Mo. banc 1990). This principle is particularly applicable to public officials, and in this case a sheriff, whose duties and office are derived from statutes. Furthermore, the record is void of any evidence, besides Mr. Russell's assertion, that he was advised that he had the authority to grant furloughs.

The trial court's judgment that Mr. Russell willfully neglected his duty with respect to the commitment of prisoners is supported by the evidence. Thus, Mr. Russell's failure to keep prisoners charged to his care, specifically Mr. Birdsong, confined in jail is sufficient grounds to support his removal from office for failing to fulfill his duty with respect to the commitment of prisoners. *See e.g., Baumgartner v. State,* 319 A.2d at 598; *See also* 60 AM.JUR.2D, *Penal and Correctional Institutions* § 23 (1987) (stating that "[a] sheriff may be prosecuted for malfeasance in office for permitting a prisoner to leave the jail unescorted and unsupervised").

### Personal Gain by Sheriff

The second area of misconduct by Mr. Russell that this court will address concerns Mr. Russell's use of his office for personal gain by using inmate labor, and by illegally taking money from the proceeds of the sheriff's auction. These actions violated § 105.452, which states, in part, as follows:

> No elected or appointed official or employee of the state or any political subdivision thereof shall:
>
> (1) Act or refrain from acting in any capacity in which he is lawfully empowered to act as such an official or employee by reason of any payment, offer to pay, promise to pay, or receipt of anything of actual pecuniary value paid or payable, or received or receivable, to himself or any third person, including any gift or campaign contribution, made or received in relationship to or as a condition of the performance of an official act, other than compensation to be paid by the state or political subdivision[.]

### 1. Using Inmate Labor for Personal Benefit

In general, states may require prisoners to perform physical labor, since "[t]he state is entitled to the labor of the convict." 60 AM.JUR.2D *Penal and Correctional Institutions* § 163 (1987). Implicit in this rule is that the benefit of inmate labor belongs to the state and not to the public officials personally. Here, it is undisputed that Mr. Russell used the labor of an inmate, Mr. Birdsong, to mow his grass, work on his car, lay carpet in his rental property, and remodel his restaurant. There was conflicting evidence from Mr. Russell and Mr. Birdsong whether Mr. Birdsong was paid. Regardless of whether the inmate was paid for the labor or volunteered to do the work, the use of inmate labor for personal benefit is improper. *See In re Collins,* 524 So.2d 553, 557 (Miss.1987) (finding that using "a prisoner to carry out personal labors on behalf of the judge" was alone sufficient grounds to justify the judge's removal from office). As the trial court noted in this case, Mr. Russell's actions amounted to involuntary servitude. *See also id.* When he needed personal labor performed, he turned to an inmate to fulfill those needs, instead of relying on acceptable means to complete the work.

His actions were improper not only in that he benefited from the use of the labor, but also in that he allowed the inmate to leave the confines of the jail in violation of the orders of sentencing courts and statutes. As discussed above with respect to the commitment of prisoners, Mr. Russell had no authority to allow an inmate to work outside the jail without a court order or statutory provision. Thus, in violation of § 105.452, Mr. Russell refrained from keeping the inmate within the confines of the jail, allowed him to work, and in return received the benefits of his labor.

Mr. Russell once again defends his actions in this regard by claiming that based upon his reading of a statute, sheriffs could employ inmates serving county time

in any manner they saw fit. Mr. Russell, however, has failed to provide the trial court or this court with the actual statute on which he relied, or with any other information that would suggest that his assertion is true. As stated above, if a person, in general, is presumed to know the law, then it is not unreasonable to expect a sheriff to know the statutes governing his duties and responsibilities. *See Myers,* 785 S.W.2d at 75. When it is to his benefit, Mr. Russell relies on statutes, whether real or imagined, that support his arguments. Yet he disregards or ignores others that defeat his position, such as § 105.452. Mr. Russell should have been on notice that his actions were questionable under § 105.452 for having received a benefit from the use of prison labor. As the trier of fact, the trial court judges the credibility of witnesses and was free to disregard Mr. Russell's assertion that his actions were based upon his interpretation of a statute. *Ken Cucchi Const.,* 973 S.W.2d at 524.

## 2. Payment of Fifty Dollars from Proceeds of Sheriff's Auction

The trial court also found that Mr. Russell had realized personal gain when he paid himself fifty dollars from the proceeds of the sheriff's auction. Mr. Russell claims, however, that the payments were permissible because working at the auction was outside the scope of his statutory duty as sheriff. He claims that he did not accept money in return for performing any acts that he was lawfully empowered to perform in his capacity as sheriff, and thus, he did not violate § 105.452.1.

■■■■ As stated above, the "official duties" of a sheriff do not encompass only those specifically listed in the statutes of this state, but extend to "those duties lying fairly within its scope, those essential to the accomplishment of the main purpose for which the office was created, and those

which ... serve to promote the accomplishment of the principal purposes." *Foote,* 903 S.W.2d at 538. The official duties of a sheriff would certainly extend to overseeing the disposal of property held by the sheriff's department. *See e.g.,* § 542.301, RSMo Cum.Supp.1998. By paying himself fifty dollars for time spent at the sheriff's auction, Mr. Russell clearly violated § 105.452.1 by receiving payment for acts within his official capacity, but from a source other than that authorized to compensate him as sheriff of Miller County.

## 3. Benefit Not *De Minimis*

Mr. Russell argues that the judgment of ouster should not have been entered because it was too harsh a remedy since any personal gain realized was of a minimal nature and was more than offset by his expenditure of personal funds and the use of his personal vehicle. Further, he argues that he paid compensation for much of the work done for him by the inmates, repaid the money for working at the sheriff's sale, and has expressed a willingness to repay the gun permit fee he had previously waived for his father. His only basis for claiming that ouster was not warranted where the benefit is *de minimis* is *State ex inf. Stephens v. Fletchall,* 412 S.W.2d 423, 428 (Mo. banc 1967), where the court held that ouster statutes are to be strictly construed.

■■■■ This court does not find Mr. Russell's argument persuasive. Regardless of whether such a defense could be asserted in this type of case, this court does not believe that the benefit was *de minimis.* The record indicates that Mr. Russell repeatedly acted in ways that provided benefits to him. Moreover, while Mr. Russell argues that he repaid the money for working at the sheriff's sale, the repayment occurred only after the investigation into the sheriff's department had begun and

the presiding commissioner expressed that it was improper for Mr. Russell to have paid himself. Likewise, Mr. Russell's expressed willingness to repay his father's gun permit fees that he waived came at trial, and only following the investigation into his department. While each instance taken individually may not have been of substantial pecuniary value, Mr. Russell's repeated and numerous acts of misconduct that provided benefits to him establish a willful neglect of his duties as sheriff.

### Disposal of Seized and Unclaimed Property

The final instance of misconduct that this court will address concerns the trial court's finding that, in relation to the sheriff's auction, Mr. Russell failed to comply with applicable provisions of law in disposing of unclaimed property by failing to file a petition or seek a court order in disposing of the property in violation of § 542.301, RSMo Cum.Supp.1998. This statute provides detailed instructions and procedures for the disposal of unclaimed, seized property depending on the nature of the property. Under this statute, disposition of property in the custody of the sheriff requires a court order.

Mr. Russell does not suggest that this statute does not apply, but attempts to justify his neglect of this statute based upon the failure of those with whom he allegedly consulted to express concern or to inform him of alternative means than those he was pursuing to dispose of the property. At trial, Mr. Russell stated that he talked with Judge Grantham about liability for selling firearms at the auction. He also stated that he talked with the county commission about what was to be done at a sheriff's sale, but they did not know. Finally, he testified that he talked with the county treasurer who gave him a photocopy of a basic sale, which stated that there needed to be an advertisement placed in the newspaper and posted in public places. Had Mr. Russell consulted § 542.301, RSMo Cum.Supp.1998, he would have been fully informed of the requirements for disposing of property. This statute charges those officers that receive such property in their official capacity with the duty and responsibility of disposing of property in the proper manner. It was clearly within Mr. Russell's duties as sheriff to properly dispose of property seized by his department, and he cannot reasonably argue otherwise.

Mr. Russell's justification that he consulted with others concerning the sale is merely an attempt to shift his duties and responsibilities as sheriff established by statute onto others. The county commission's lack of knowledge does not justify his lack of knowledge, especially when the duty to properly dispose of seized property lies with the sheriff and not the commission. Further, Judge Grantham denied having had a conversation with Mr. Russell concerning liability for selling guns at the auction. The only conversation Judge Grantham recalled having with Mr. Russell about the auction occurred following the completion of a criminal docket when the sheriff and the prosecuting attorney were in court. Mr. Russell asked Judge Grantham about having an auction, and Judge Grantham stated that he thought it was a good idea. Judge Grantham believed that he may have told Mr. Russell that he would help the sheriff with the auction, but he had no conversation with Mr. Russell concerning the procedures for such an auction.

Any "lack of concern" by these other county officials about holding the auction did not provide justification for Mr. Russell to act in any manner that he saw fit, disregarding applicable statues in the process. Even if Mr. Russell was unaware of the precise statute concerning the disposal of property, his failure to even consult the

state statutes on this issue constitutes a willful neglect of his duty as sheriff.

## Conclusion

The findings of the trial court provide numerous bases upon which to support the judgment of ouster. The conduct of Mr. Russell exhibited a disregard for the law and his statutory duties as sheriff. This court finds that given the evidence at trial and the statutory duties imposed upon a sheriff with respect to the charge and commitment of prisoners, the trial court's finding of a gross and willful neglect of a known duty is supported by the evidence. *See Riley,* 590 S.W.2d at 907 (stating that when a sheriff commits an act of misconduct, the office is automatically forfeited). Furthermore, the evidence at trial supports the judgment of ouster based upon Mr. Russell's receipt of personal gain from the office of sheriff and his disposal of property without a court order. *See id.* The judgment of the trial court is affirmed.

All concur.