Thomas A. TURNER, Plaintiff–
Respondent,

v.

Thomas A. SHALBERG, Defendant–
Appellant.

No. 24109.

Missouri Court of Appeals,
Southern District,
Division II.

March 27, 2002.

Richard L. Schnake, of Neale & Newman, L.L.P., of Springfield, MO, for Appellant.

W. Gary Drover, of Camdenton, MO, for Respondent.

JAMES K. PREWITT, Judge.

Thomas A. Shalberg appeals from the decision of the Circuit Court of Camden County finding him liable to Thomas A. Turner for $28,500 damages for breach of contract for failing to close on the sale of Buster's Billiards, a pool hall in Camdenton, Missouri. Shalberg claims that any damages for the alleged breach of contract would be nominal, as the only evidence of the value of the business as a going concern is the contract price of $41,500, and a seller suffers no damages if the value of the business equals or exceeds the contract price. Shalberg also challenges the court's award of attorney's fees to Turner. We affirm the decision of the trial court.

### Facts

Buster's Billiards ("Buster's") first opened for business in 1995. Respondent Turner leased the building in which it was located. He and his wife Janet borrowed $27,500 through an SBA loan with a local bank to begin operations and took out another loan to purchase equipment. The business and liquor licenses were in Janet's name.[1]

Because Turner, a newspaper publisher, and his wife, a Yellow Pages account representative, had full-time employment outside of Buster's, Turner's son, Jeff, managed the business. The revenue Buster's generated under Jeff's management was adequate to cover the loan payments, and the Turners were content to operate the business as long as that was the case. But, when Jeff decided he no longer wanted to manage the business, the Turners decided to sell Buster's.

The listing price for Buster's was $89,900. They eventually sold the busi-

---

1. There is no issue here regarding Janet Turner not being a party. Plaintiff alleged in his petition that he was the owner of Buster's.

Janet Turner testified that before the sale to Defendant she had given all her interest in the business to Plaintiff.

ness to Brent Geraughty in October 1996 for the negotiated price of $79,675. Geraughty paid the Turners $6,500 cash and executed promissory notes to them for the remainder. The larger of the two promissory notes required monthly payments of $1,100, beginning in December 1996. Geraughty stopped making payments on the note in May 1997. Recognizing that Geraughty would default on the loan, the Turners sought another buyer.

Appellant Shalberg offered to buy the business after Geraughty defaulted. Shalberg and Respondent negotiated a sale price of $41,500 and executed a contract dated June 26, 1997, for the sale of Buster's. The contract noted that only the "business, inventory, equipment and name" were being sold, not the real estate (which the Turners and Geraughty had leased from someone else). It contained a provision for remedies in the event of default, and stated that the non-defaulting party would be entitled to reimbursement for attorney's fees, court costs, and legal expenses. The closing was set for July 31, 1997.[2]

Turner and Shalberg agreed to let Geraughty continue to operate Buster's "as long as possible, as close to the date of [Shalberg] taking over as possible so that it doesn't sit there with the lights off" and so customers would "keep coming in and so on and so forth."

A couple of weeks prior to the scheduled closing date, Shalberg called Turner and

---

2. Section 18 of the contract provides,

> 18. Default and Remedies: Seller or Buyer shall be in default under this Contract if either fails to comply with any material covenant, agreement, or obligation within any time limits required by this Contract. Following a default by either Seller or Buyer under this Contract, the other party shall have the following remedies, subject to the provisions of paragraph 19 of this Contract:
>
> (a) If Seller defaults, Buyer may (i) specifically enforce this Contract and recover damages suffered by Buyer as a result of the delay in the acquisition of the Property; or (ii) terminate this Contract by written notice to Seller, and, at Buyer's option, pursue any remedy and damages available at law or in equity. If Buyer elects to terminate this Contract, the earnest money deposit, less any expenses incurred by or on behalf of Buyer, shall be returned to Buyer.
>
> (b) If Buyer defaults, Seller may (i) specifically enforce this Contract and recover damages suffered by Seller as a result of the delay in the sale of the Property; or (ii) terminate this Contract by written notice to Buyer, and, at Seller's option, either retain the earnest money as liquidated damages as Seller's sole remedy (the parties recognizing it would be extremely difficult to ascertain the extent of actual damages caused by Buyer's breach and that the earnest money represents as fair an approximation of such actual damages as the parties can now determine) or pursue any other remedy and damages available in law or equity. If at Seller's option, the earnest money is to be retained by Seller as liquidated damages as Seller's sole remedy, the earnest money deposit shall first go towards reimbursing the expenses of Seller and Seller's agent incurred in this transaction, and the balance to be paid one-half (½) to Seller and one-half (½) to Seller's named agent in lieu of commission; provided, however, that said agent in no event shall receive any sum of money for his services greater than the amount agreed to as compensation.
>
> If, as a result of default under this Contract, either Seller or Buyer employs an attorney to enforce its rights, the defaulting party shall, unless prohibited by law, reimburse the nondefaulting party for any expenses in connection with this transaction and for all reasonable attorney's fees, court costs, and legal expenses incurred by the nondefaulting party in connection with this transaction and the default.

Shalberg's counsel argued at trial that the contract the parties executed, a form contract for the sale of real estate, contained provisions requiring proof of marketable title and other impossibilities, and that Turner should not be able to "pick and choose" what provisions of the contract were enforceable. Shalberg does not argue this on appeal.

told him that his investor, who was going to contribute $10,000 towards the purchase price, had "pulled out," and he "no longer had a manager." Shalberg continued to "negotiate for the completion of the transaction" by requesting a copy of the lease and looking for another manager; however, he never filled out a loan application at any lending institution in an attempt to get a loan to purchase the business.

On or about July 28, 1997, Turner called Shalberg to discuss the closing, which was to take place on July 31. Turner had removed Geraughty from the building and was ready to close. Turner did not have a lease agreement, liquor license, or business license in either his or his wife's name at that time, as Geraughty had obtained those separately and Shalberg was to do the same. It was during that conversation that Shalberg informed Turner he had no intention of closing the sale.

On July 30, Turner received a fax from Shalberg's loan officer, Matt Redd, of a letter dated July 25, from the loan officer to Shalberg indicating that financing was not available. The financing contingency expired on July 25. Redd admitted at trial that Shalberg had never requested the amount he needed to finance the sale, that Shalberg called him on July 28 or 29 to let him know he wasn't going to close, that he asked Shalberg if the contract had a financing contingency, and that he actually wrote the letter dated July 25 on July 29 or 30. Redd said that Shalberg had requested a lower amount than indicated in the contract and had been approved informally for that amount. He indicated that he never would have approved Shalberg for the full amount required by the contract.

Turner did not attempt to sell Buster's to anyone else, nor did he reopen Buster's. Instead, on August 15, 1997, he liquidated the personal property. Turner placed a full-page advertisement in the newspaper and called other business owners to invite them to the sale. Although he "certainly tried to get the best price" he could, he accepted any "reasonable offer" he received. Because Turner still owed the bank money for the equipment and wanted to reduce his indebtedness to the bank by the sale, he had purchasers write checks payable to the bank. Turner received a total of $9,750 from the sale of the equipment, which was not enough to satisfy the remaining debt on the loan.

On January 12, 1998, Turner filed a petition alleging that Shalberg breached the contract. Turner requested damages in the amount of $28,500 and "a reasonable amount" for his attorney's fees, legal expenses, and court costs. Shalberg claimed among other things that Turner failed to mitigate his damages. After a bench trial, the court found that Shalberg "failed to use reasonable diligence to obtain financing as required by the terms of the contract and that [Shalberg] failed and refused to close the transaction as required by the terms of the contract." The court found that Turner was "ready, willing and able to close the transaction under the terms of the contract on the closing date." The court awarded Turner $28,500 in actual damages and $6,700 for reasonable attorney's fees and legal expenses. This appeal follows.

## Standard of Review

We will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Bowles v. All Counties Inv. Corp.*, 46 S.W.3d 636, 638 (Mo.App.2001). "We review the evidence in the light most favorable to the prevailing party, giving that party the benefit of all reasonable inferences, disregarding the

contrary evidence and inferences." *Ford Motor Credit Co. v. Henson,* 34 S.W.3d 448, 450 (Mo.App.2001). As set forth in Rule 84.13(d), we review the case upon both the law and the evidence, giving due regard to the trial court's opportunity to judge the credibility of the witnesses.

## Discussion

■ Shalberg raises two points on appeal. In his first point, Shalberg argues that the trial court erred in entering judgment against him for $28,500 in actual damages, "because Turner proved no difference between the contract price and the fair market value of Buster's Billiards as of the time fixed for closing of the sale to Shalberg, in that the only evidence of the fair market value of Buster's Billiards as a going concern, on the date scheduled for the closing, is the contract price of $41,500." Shalberg does not argue on appeal that he did not breach the contract; rather, he argues that Turner suffered no damages from the breach.

■ The purpose of an award of damages is to make the injured party whole by monetary compensation. *Kincaid Enters., Inc. v. Porter,* 812 S.W.2d 892, 900 (Mo. App.1991). A party is injured if a legal right of that party is violated. *Id.* In a breach of contract case, the measure of damages is the benefit of the bargain, *i.e.,* "the value of the performance of the contract." *Id.* For the seller, in this case Turner, to recover damages for the buyer's breach of contract, he must show that the contract price exceeds the fair market value of the property being sold on the relevant date. *See* Dan B. Dobbs, *Dobbs Law of Remedies* § 12.2(2) (2d ed. 1993). That date "is almost always the date when performance was due." *Id.* See also *Hoelscher v. Schenewerk,* 804 S.W.2d 828, 832 (Mo.App.1991) (regarding buyer's breach for sale of real estate).

The parties dispute what the "fair market value" should be in this case. Shalberg argues that the contract sought to sell the business as a going concern, so that the contract price is the only evidence of the fair market value of the business. Should the contract price be the appropriate measure of the fair market value, then Turner suffered no damages from Shalberg's breach.

■ It is true that the value of an ongoing business may exceed the value of the "hard assets" of the business, as intangibles such as tradenames, goodwill, and the transfer of business licenses, insurance contracts, and leases also may be valued. *See Morgan Publ'ns., Inc. v. Squire Publishers, Inc.,* 26 S.W.3d 164, 174–75 (Mo. App.2000), and cases cited therein (discussing whether the sale of a business is governed by the Uniform Commercial Code using the predominant purpose test). The contract between Turner and Shalberg provided that the sale of Buster's included the "business, inventory, equipment and name." Clearly, the contract contemplated the sale of an ongoing business, with elements such as the business name and customer base contributing to the value beyond that of the business's hard assets.

Turner claims that by permitting the previously defaulting owner of Buster's to continue to operate it until a few days before the closing, Shalberg was to "receive the benefits of an ongoing business," but "[i]n reality, there was to have been no ongoing business," because Turner did not have the liquor or business licenses necessary to run the business. Shalberg was to acquire those items on his own. Turner argues that Shalberg's eleventh-hour breach caused a diminution in the value of the property, and suggests that the amount he received for the assets in the

liquidation sale is the closest measure of the fair market value of the business.

■ "Fair market value" is "a phrase without ambiguity in the law." *Peterson v. Cont'l Boiler Works, Inc.*, 783 S.W.2d 896, 900 (Mo.banc 1990). "It means 'the price which property will bring when it is offered for sale by an owner who is willing but under no compulsion to sell and is bought by a buyer who is willing or desires to purchase but is not compelled to do so.'" *Id.* (quoting *Carter v. Matthey Laundry & Dry Cleaning Co.*, 350 S.W.2d 786, 794 (Mo.1961)). It is determined not just by value to the owner, but also by the price that one who wishes, but does not need to buy, will pay. *Peterson*, 783 S.W.2d at 900. If the seller resells the property within a reasonable time after the buyer's breach, "'the price obtained is some evidence of market value.'" *Hoelscher*, 804 S.W.2d at 832 (quoting *Leonard v. Am. Walnut Co.*, 609 S.W.2d 452, 455 (Mo.App.1980)).

■ Shalberg argued in his answer and suggests on appeal that Turner should have reopened Buster's or found another buyer for Buster's to mitigate his damages. While Turner had a duty to mitigate his damages, that duty did not arise until he learned of the breach. *A.G. Edwards & Sons, Inc. v. Drew*, 978 S.W.2d 386, 391 (Mo.App.1998). He was not required to take that action which, "upon aforethought," would have been more advantageous to him. *Id.* Because Turner did not have business or liquor licenses for Buster's, he was unable to reopen the business himself to keep the business running until he found another buyer. Shalberg knew that the continuity of Buster's depended on him quickly taking over the business from Geraughty. By breaching the contract, it was Shalberg, not Turner, who caused the business to fail.

In this case, then, the trial court could find that the relevant time for measuring the fair market value of the property which was the subject of the contract between Turner and Shalberg is the day of Turner's liquidation sale or that the proceeds received that day reflected the value of the business on the day the sale was to have been closed. While Turner was able to offer Shalberg an "ongoing business" by keeping Geraughty in possession until shortly before the scheduled closing, after Shalberg's breach, all he had to offer were the business assets. It is unlikely anyone would have paid for a going business as it would take some time to get the business reopened. Because the contract price exceeded the fair market value of the business assets Turner retained after Shalberg's breach, he was entitled to damages. We find no error in the trial court's award. Point I is denied.

■ In his second point, Shalberg argues that the trial court erred and abused its discretion in awarding Respondent Turner $6,700 for his "reasonable attorney's fees and legal expenses" because "the award bears no reasonable relation to the amount of damages Turner proved," the record does not indicate what factors the trial court considered in determining the amount of the award, and Turner's failure to pay for deposition charges in a timely manner contributed to the legal expenses for which he seeks reimbursement. Shalberg claims it was not reasonable for Turner to proceed with the litigation because the attorney's fees required to effectuate the benefit he sought outweigh the benefit due to him which, as previously noted, Shalberg believed was nothing. *See Next Day Motor Freight, Inc. v. Hirst*, 950 S.W.2d 676, 680 (Mo.App.1997).

■ "'The setting of attorney's fees is within the sound discretion of the trial court and should not be reversed unless

the award is so arbitrary or unreasonable that it indicates indifference and lack of proper judicial consideration.'" *Fleetwood/Edwards Chevrolet, Inc. v. Fleetwood Chevrolet,* 9 S.W.3d 62, 67 (Mo.App.2000) (quoting *Estate of Strauss v. Schaeffer,* 781 S.W.2d 274, 275 (Mo.App.1989)). Shalberg carries the burden to affirmatively establish that the fees the court awarded Turner manifested a clear abuse of discretion. *Fleetwood,* 9 S.W.3d at 68.

■■■■■■ Under Missouri law, litigants are required to pay their own attorney fees "absent statutory authorization or contractual agreement." *Strain–Japan R–16 Sch. Dist. v. Landmark Sys., Inc.,* 51 S.W.3d 916, 922 (Mo.App.2001). If a contract authorizes the payment of attorney's fees in the enforcement of a contract provision, "the trial court must award them to the prevailing party." *Howe v. ALD Servs., Inc.,* 941 S.W.2d 645, 652 (Mo.App.1997). We determined in our resolution of Point I that the court did not err in awarding Turner $28,000 in actual damages; however, an award of attorney's fees may be proper even if the prevailing party suffered only nominal damages. *See Evans v. Werle,* 31 S.W.3d 489, 493 (Mo.App.2000).

Section 18 of the agreement between Turner and Shalberg provides that if, as a result of default under the contract, either party employs an attorney to enforce his rights, "the defaulting party shall ... reimburse the nondefaulting party for ... all reasonable attorney's fees, court costs, and legal expenses incurred by the nondefaulting party in connection with this transaction and the default." Because Shalberg defaulted on the contract, he is obligated under the terms of the contract to reimburse Turner for his legal expenses. *See Whitman's Candies, Inc. v. Pet Inc.,* 974 S.W.2d 519, 530 (Mo.App.1998) (upholding award of attorney's fees where contract permitted fee award and court denied ap-

pellant's other points). We do not find the $6,700 award arbitrary, unreasonable, or excessive. Point II is denied.

The judgment is affirmed.

GARRISON, P.J., and PARRISH, J., concur.