R.J.S. SECURITY, INC.,
Plaintiff/Appellant,

v.

COMMAND SECURITY SERVICES, INC., William Ballard and Phil Danforth, Defendants/Counter–Plaintiffs, Third–Party Plaintiffs/Cross–Appellants,

and

Roger J. Strope, Third–Party Defendant/Respondent.

Nos. WD 60390, 60398.

Missouri Court of Appeals, Western District.

Jan. 14, 2003.

Motion for Rehearing or Transfer Denied March 12, 2003.

Application for Transfer Denied April 22, 2003.

**4**

James A. Kessinger, Kansas City, MO, for appellant.

Robert J. Bjerg, Kansas City, MO, for respondents.

Before NANCY STEFFEN RAHMEYER, Presiding Special Judge, CHARLES B. BLACKMAR, Senior Judge, and WILLIAM E. TURNAGE, Senior Judge.

NANCY STEFFEN RAHMEYER, Presiding Special Judge.

R.J.S. Security, Inc. ("Appellant") brought suit against Command Security Services, Inc. ("Command Security"), William Ballard ("Ballard") and Phil Danforth ("Danforth") collectively, ("Respondents") for various damages related to the sale of a security guard company to Respondents, who also brought counterclaims against Appellant. The Circuit Court of Jackson County entered judgment for Appellant and Respondents on different counts and both now appeal the trial court's decision. We affirm in part, reverse in part, and remand with instructions to the trial court.

### Facts

Appellant was a Missouri corporation engaged in the private security guard business with its principal place of business in Kansas City, Missouri. Roger J. Strope ("Strope") founded the company in 1981 and was the president and sole shareholder. In 1997, Strope decided to retire from the security guard business and placed the

company for sale with a business broker. Ballard and Danforth, officers and equal shareholders of Command Security, responded to the advertisement and entered into negotiations with Strope for the purchase of Appellant's assets.

As part of their initial review of the company, Respondents received Appellant's recent financial statements, tax returns, and sales information which included gross sales and net cash flow figures for 1994–1997. On December 18, 1998, the parties entered into an Asset Purchase Agreement in which Command Security agreed to purchase Appellant and all of its assets, including its intangible assets relating to the business, for $450,000. Respondents also agreed to pay Strope an additional $7,500 to serve as a consultant for a 90–day transitional period following the closing on January 18, 1999.

Later that month and subsequent to the Asset Purchase Agreement, Strope disclosed to Respondents that Appellant faced a 60–day suspension from the Kansas City Missouri Police Department for failing to remove the commission of a terminated security guard and that the suspension was stayed pending an appeal to the Kansas City Missouri Police Board ("Police Board"). The sale was placed on hold while the parties met to reach a settlement with the Police Board. The Police Board agreed to grant Respondents a security guard license without the suspension so long as Respondents did not utilize the name of R.J.S Security, Inc. and Strope had no financial or managerial involvement with the new company.

As a result of the agreement with the Police Board, the parties amended the Asset Purchase Agreement to remove the R.J.S Security, Inc. business name from the list of assets to be purchased, to reduce the purchase price of R.J.S Security, Inc. from $450,000 to $400,000, and to re- move Strope's consulting position from the agreement. There is no evidence concerning the method used to determine the new price.

Shortly before the scheduled closing, Respondents met with Mary Erwin ("Erwin"), Appellant's insurance agent, to discuss Appellant's insurance coverages, costs of premiums, and to inquire about any claims against the company. Erwin allowed Respondents to review Appellant's insurance files, which included payroll figures and other information submitted in previous insurance applications. Respondents noted discrepancies between the insurance applications and tax returns, but Erwin assured them Appellant had passed every annual insurance audit without any additional insurance premiums due. Erwin also informed Respondents that Appellant's annual insurance premium for 1998 totaled $50,647.25. Based on this information, Respondents submitted insurance applications for insurance coverage to begin immediately upon the closing of the sale.

On January 15, 1999, the parties closed on the sale of R.J.S. Security, Inc. As per the Asset Purchase Agreement, Respondents paid $400,000 for the company in the form of a $229,100 cash payment due at closing and a $170,900 promissory note from Command Security to Appellant. Ballard and Danforth each signed a personal guarantee of the promissory note, which established an eight percent interest rate payable in monthly installments over a seven-year period and contained an acceleration clause. The Asset Purchase Agreement included all assets, tangible and intangible, relating to the business, and a non-compete clause in which Strope agreed not to compete with Respondents within a 50–mile radius of Kansas City over the next five years, and other employment restrictions.

Strope remained at Command Security in a non-managerial capacity for approximately six weeks following the closing to assist in the transition to the new business. During this transition period, the company received as much as $250,000 in new security contracts. Respondents also began to transition the R.J.S. Security, Inc. name, customer accounts, and company contracts over to the Command Security name, but experienced some difficulty in this process. One issue concerned a $2,314 refund check payable to R.J.S. Security, Inc. that Command Security received in March, 1998, from its workers' compensation insurance carrier. The check was not accompanied by any information explaining the purpose of the refund and, believing the refund belonged to Command Security, Respondents endorsed the check in the names of both R.J.S. Security, Inc. and Command Security Services, Inc. and deposited it into Command Security's accounts. The following day, Respondents received a letter from the insurance carrier which explained that the refund related to premiums paid in 1998. Respondents realized that the check belonged to Appellant, wrote a check payable to Strope in the same amount and had an employee hand-deliver it to Strope. Strope testified that he never received the check.

Subsequent to the closing, Strope released several guards from their non-compete agreements with Appellant. Strope also contacted Command Security employee Fran Liebisch ("Liebisch") and presented her with an opportunity to leave Command Security and accept employment with a competing security guard company located near Kansas City, Missouri.

In March 1999, Respondents realized that the 1999 payroll for their security guards would exceed the payroll figures stated on their insurance applications. Respondents' review of the records revealed that Strope and Appellant manipulated payroll figures by providing a separate set of payroll records for insurance audits which reflected only one-half the payroll amount stated on its tax returns. Respondents submitted new information to the insurance companies and, based on the new information, Respondents' insurance premiums increased from $50,647.25 to $85,410.25.

Respondents contacted Strope about the misrepresentation on the insurance premiums and requested that Strope reduce the balance on the promissory note by $75,000.[1] Strope refused. Respondents informed Appellant that no further payments would be made on the promissory note until the issue was resolved. In response, Appellant accelerated the promissory note and filed suit, seeking payment on the note plus interest and other damages. Respondents filed a counterclaim against Appellant seeking a reduction on the promissory note to account for Appellant's misrepresentation about the insurance premiums and claiming damages for tortious interference of a contract.

Appellant brings five points of trial court error on appeal. In Point I, Appellant contends the trial court should not have awarded Respondents $35,000 in damages for Appellant's misrepresentation of the correct amount of insurance premiums it owed because Respondents did not satisfy the elements for a fraud claim, because Respondents waived the fraud claim prior to the purchase, and the increased insurance premiums did not equal the difference in the value of the business before and after the sale took place. In

---

1. Respondents initially sought $75,000, an amount equal to 2.5 times the estimated underpayment of $30,000. Trial testimony revealed the actual insurance underpayment was $35,000, and Respondents then increased the amount sought to $87,500.

Point II, Appellant contends the trial court should not have awarded $10,000 to Respondents for tortious interference stemming from Appellant's release of several employees from non-compete contracts because Respondents did not satisfy the requirements for tortious interference in that the sale only included business assets, and not the employment contracts, and that an employment contract may not be assigned without the permission of the employee. In Point III, Appellant contends the trial court failed to award the full amount of interest due on the promissory note and failed to award interest due on an insurance refund due to Appellant. In Point IV, Appellant contends the trial court should have found that Respondents wrongfully used Appellant's name. Finally, in Point V, Appellant contends the trial court should not have awarded Respondents $100 in nominal damages as an offset against the promissory note for violating the Covenant Not to Compete because the agreement did not bar Appellant from working for another security company and Missouri law does not enforce covenants restricting Appellant's contact with employees.

Respondents cross-appeal with five points of claimed trial court error. In Point I of their cross-appeal, Respondents contend the trial court should not have barred their counterclaim for breach of contract because that theory of liability was not inconsistent with their counterclaim for fraud. In Point II of their cross-appeal, Respondents contend the trial court should have awarded to them $87,500 to reflect the true measure of damages resulting from Appellant's misrepresentation regarding the true cost of the insurance premiums. In Point III of their cross-appeal, Respondents argue that Appellant breached the purchase agreement first, and therefore, the note and interest should not be accelerated. Respondents further claim no interest is due on the insurance refund because Appellant did not succeed in its conversion claim. In Point IV of their cross-appeal, Respondents contend the trial court should have awarded attorney's fees on the claim of fraud because the Asset Purchase Agreement specifically provides for such an award. Finally, in Point V of their cross-appeal, Respondents contend the trial court should not have entered judgment against Ballard and Danforth in their individual capacities in Appellant's claim for payment of the promissory note because Appellant did not assert any claim against either party in the initial petition and neither individual consented to the addition of any claim filed against them individually.

The trial court found in favor of Appellants on the issue of the acceleration of the note and ordered Respondents to pay the remaining balance plus $26,676.61 in interest, $12,500 for attorney's fees, and $1,100 for unpaid receivables due Appellant. The trial court found in favor of Respondents on the claim of misrepresentation and ordered a $35,000 offset against the promissory note; the court entered judgment on the tortious interference of a contract claim for Respondents in the amount of $10,000 and on the claim for breach of the covenant not to compete in the amount of $100.

We affirm the trial court's decision on all issues save for the award of interest on the promissory note. We reverse and remand to the trial court to enter a judgment including the additional interest that accrued on the promissory note during the four months between the trial and the date of the judgment.

### Standard of Review

In a court-tried case, the judgment of the trial court will be affirmed

unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Reardon v. Newell*, 77 S.W.3d 758, 760 (Mo. App. S.D.2002). The credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe all, part, or none of the testimony of any witness. *Harris v. Desisto*, 932 S.W.2d 435, 443 (Mo.App. W.D.1996). We accept as true evidence and inferences favorable to the trial court's judgment, disregarding all contrary evidence. *Id.*

### Appeal Point I, Cross–Appeal Point II—Misrepresentation

■ Appellant first contends the trial court should not have awarded Respondents $35,000 in damages for Appellant's misrepresentation of the correct amount of insurance premiums owed by Appellant. Appellant argues that Respondents "impliedly" waived their claim when evidence was produced at trial that Respondents knew of a discrepancy between the payroll calculations for the insurance premiums and tax returns and that Respondents did not rely upon Appellant's misrepresentations because they did their own investigation.[2]

The evidence established that, prior to each policy year, Appellant and Strope submitted new insurance applications to allow its carriers to measure the risks and determine the amount of the premiums. Appellant provided estimated payroll figures indicating approximately half the payroll amount stated on its tax returns on a set of handwritten payroll records to calculate premiums and for annual insurance audits which reflected different payroll figures than those submitted on its tax returns. As a result, Appellant's insurance premiums were substantially lower than what they would have been if based upon the payroll figures stated in the income tax returns.[3]

Appellant provided Respondents with information and figures regarding the company's finances, including the information regarding the cost of worker's compensation and general liability insurance premiums. Although Respondents noted the discrepancies, Appellant and its insurance agent, Erwin, represented this information as accurate, and Erwin told Respondents that Appellant consistently passed yearly insurance audits. The purchase agreement further represented that "[a]ll written information supplied by Seller and Shareholder to Buyer for its review was and is true, accurate and complete." Approximately six weeks after the closing, however, Respondents discovered the insurance premiums were not based upon actual payroll figures and demanded an $87,500 reduction in the purchase price to reflect the higher cost of the insurance.

The misleading nature of the payroll records provide substantial evidence upon which the trial court could find that Respondents were not aware of the true amount of the payroll for the necessary

---

2. To succeed in a claim of fraudulent misrepresentation, a plaintiff must show:
 (1) a false, material representation; (2) the speaker's knowledge of its falsity or his ignorance of the truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the representation; (5) the hearer's reliance on its truth; (6) the hearer's

right to rely thereon; and (7) the hearer's consequent and proximately caused injury. *Artilla Cove Resort, Inc. v. Hartley*, 72 S.W.3d 291, 296–97 (Mo.App. S.D.2002).

3. Appellants disputed the motives for separate books but we accept as the evidence and inferences favorable to the trial court's judgment.

insurance premiums when they purchased the business. While Appellant provided all the pertinent information, it manipulated the manner in which the information was presented to understate the true costs of insurance. We also find that substantial evidence exists to support the trial court's finding that Respondents relied upon Appellant's misrepresentations. Respondents inquired about the discrepancies, but were assured by both Appellant and Erwin the insurance policies were accurate. Erwin further stated that Appellant could not pass its annual insurance audits unless the data was accurate. After receiving these assurances, Respondents dropped the matter until further review of the figures several months later revealed the misrepresentation.

 Appellant's argument that other evidence demonstrating Respondents' knowledge of the discrepancies is of no consequence. "On appeal, in considering the sufficiency of the evidence, this court accepts as true the evidence and permissible inferences favorable to the judgment and disregards contradictory evidence." *Artilla Cove Resort, Inc. v. Hartley,* 72 S.W.3d 291, 297 (Mo.App. S.D.2002) (quoting *Luna v. Smith,* 861 S.W.2d 775, 780 (Mo.App. S.D.1993).) As indicated herein, we find that substantial evidence exists upon which the trial court could find that Respondents had no knowledge of the fraud and, therefore, could not waive their claim.

Appellant next challenges the measure of damages applied by the trial court in determining its award, arguing that the trial court's award is not supported by sufficient evidence because Respondents' evidence only establishes a $33,600 increase in their insurance premiums in the first year. Appellant argues that the trial court failed to recognize that insurance premiums are not static and it did not

account for the impact of up to $250,000 in new security contracts on the insurance premiums. Respondents cross-appeal the award of damages and contend the trial court should have awarded $87,500 to reflect the true measure of damages of the lost benefit of their bargain. We affirm the decision of the trial court on both points.

 "The purpose of an award of damages is to make the injured party whole by monetary compensation." *Turner v. Shalberg,* 70 S.W.3d 653, 658 (Mo. App. S.D.2002). "A party is injured if a legal right of that party is violated." *Id.* Missouri courts generally apply the benefit of the bargain rule to determine damages in cases of fraud and deceit, and will award a defrauded party the difference between the actual value of the property and what its value would have been as represented. *Williams v. Finance Plaza, Inc.,* 78 S.W.3d 175, 181 (Mo.App. W.D.2002). *See also Heberer v. Shell Oil Co.,* 744 S.W.2d 441, 443 (Mo. banc 1988).

Here, the trial court found that Appellant "made affirmative representations that the R.J.S. Security books and records were true, accurate and complete," and that "the combination of [Appellant's] books, records and representations constituted a misrepresentation as to a material element of the agreement." The insurer relied upon these records in calculating the insurance premium and Respondents relied upon those figures in determining the value of the company. Respondents discovered the discrepancies and requested a new rate based on the corrected data, and evidence shows that the insurance premiums increased by approximately $33,600 the first year.

While Appellant argues that the measure of damages should at most reflect this $33,600 increase, Respondents contend in their cross-appeal that the trial court in-

correctly calculated the damages and that the measure of damages should be much higher to reflect the true lost benefit of their bargain. Respondents argue that as a result of the insurance premiums being substantially greater than represented, the cash flow of the business was substantially reduced. Respondents presented evidence to show the projected future impact the discrepancies would have upon the value of the business, and argued that, at 2.5 times the average cash flow of Appellant, the actual measure of damages should be $87,500. The insurance agent supported this argument, testifying that an increase in premiums was not a one-time event, but would carry forward to subsequent years.

On the other hand, there was evidence indicating there was up to a $250,000 increase in new security contracts which would increase the payroll expense, thus increasing the insurance costs. Furthermore, there was evidence that the final value of the business was ascertained by some method other than using 2.5 times the average cash flow. Respondents' argument that the business had a cash flow of $135,000 to $155,000 does not assist them in calculating the damages. If the court multiplied the high figure for cash flow by 2.5 times (the method claimed by Respondents), the value of the business would be $387,500. Respondents paid $400,000 for the company, a difference of $12,500. Furthermore, Respondents calculated damages using the cash flow method which was used for the original selling price, not what Respondents actually paid for the business or the method that was used to calculate the actual value at the time of sale.

"An appellate court interferes with the assessment of damages only when the damages awarded are so excessive that the conscience of the court is shocked and the appellate court is convinced the fact

finder abused its discretion in determining that amount." *Artilla Cove*, 72 S.W.3d at 301. We find that the value of damages assigned by the trial court was within the range of values testified to, and in light of the variable factors utilized in determining a value, the record supports the trial court's valuation. *See Norman v. Norman*, 604 S.W.2d 680, 684 (Mo.App. S.D.1980) (where value is within range testified to and evidence is diffuse and imprecise in nature, trial court's valuation was not an abuse of discretion). The court may have considered the increased payroll costs associated with the increased business, may have awarded an amount to compensate Respondents for the pursuit of damages, and the actual accurate amount of loss to the value of the business. Because there was no precise method of determination of the value in the agreed upon sale price, the court was within its discretion in its calculation of damages. Point I of the appeal is denied, as is Point II of Respondent's cross-appeal.

### Appeal Point II—Tortious Interference with Employment Contracts

In Point II, Appellant contends the trial court should not have awarded $10,000 to Respondents for tortious interference stemming from Appellant's release of several employees from their non-compete contracts. Appellant argues that the sale of R.J.S. Security, Inc. was merely for the business assets, the non-compete agreements could not be transferred without the employee's consent, and claims Respondents failed to establish Appellant's knowledge of an employment relationship between the employees and Respondents. Conversely, Respondents contend the asset purchase agreement specifically included all "intangible assets," which included the non-competition agreements.

The trial court found in its Findings of Fact and Conclusions of Law that the non-competition covenants constituted intangible assets and goodwill and that those assets passed from Appellant to Respondents upon the transfer of the company. The facts indicate that, as part of their employment agreement, R.J.S. Security, Inc. employees signed non-compete agreements that restricted them from working within 50 miles for a six-month period after the termination of their employment. These agreements existed prior to Respondents' purchase of the company and Appellant admitted the security guards were a valuable asset of the company and the non-compete agreements increased the value of the company. Appellant informed Respondents of the existence of the agreements during the negotiations to purchase the business and Respondents testified that the employees were a factor in their decision to purchase the company. Therefore, we find that substantial evidence exists upon which the trial court could find the non-compete agreements to be an intangible and valuable asset of the purchase agreement. Respondents certainly had a business expectancy of the continued employment of the security guards.

 Appellant argues that Respondents did not establish that it tortiously interfered with the non-competition contracts between Command Security and its employees. Tortious interference with a contract is described as:

> One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Birdsong v. Bydalek,* 953 S.W.2d 103, 111 (Mo.App. S.D.1997) (citations omitted).

 Appellant claims that Respondents failed to present substantial evidence showing Strope knew of the contract or employment relationship with Command Security at the time he released the employees from their non-compete agreements, that Strope intended the release to interfere with Command Security's relationship with the employees, and that Strope acted without justification. The facts indicate that Appellant recruited and employed the guards to work at R.J.S. Security, Inc. and he subsequently sold the company to Respondents. As discussed, *supra,* the purchase agreement transferred to Respondents all intangible assets and goodwill, which included the non-compete agreements with the employees. After the sale Appellant released several Command Security employees from their non-compete agreements, causing those employees to breach their non-competition covenants while they were still employed at Command Security. Those employees then left Command Security to seek employment with competing security firms, thereby harming Respondents who had contracted for intangible assets such as the non-compete agreements. Further, Appellant had already sold the company to Respondents at the time the employees were released from the non-competition agreements. Clearly, Appellant had no justification in releasing Command Security employees from their non-compete agreements. Point II is denied.

### Appeal Point III—Prejudgment Interest

Appellant next contends the trial court failed to award the full amount of interest due on the promissory note and failed to award interest due on the insurance refund check belonging to Appellant which was cashed by Respondents two years ear-

lier. Respondents counter with the arguments that Appellant did not succeed in its conversion claim and interest on the insurance refund was improper. We will address Respondents' counterclaim regarding their contention that the note should not have been accelerated and that no interest is due in the discussion of Point III of the cross-appeal.

We first consider the issues pertaining to the promissory note. The trial court found in its Findings of Fact and Conclusions of Law that Command Security was obligated to pay Appellant the $169,650.20 outstanding balance on the promissory note plus interest thereon in the amount of $26,676.61, as per the contract rate. Appellant now seeks an adjustment of that award because Respondents paid no interest on the note for the time period between the trial, when Appellant claimed $26,676.61 in unpaid interest, and the judgment, which was rendered four months later and during which time nearly $4,500 in additional interest accrued.

■■■■ " 'Interest' is the measure of damages for failure to pay money when payment is due even though the obligor refuses payment because the obligor questions legal liability for all or portions of the claim." *Miller v. Gammon & Sons, Inc.*, 67 S.W.3d 613, 624 (Mo.App. W.D.2001) (quoting *J.R. Waymire Co. v. Antares Corp.*, 975 S.W.2d 243, 248 (Mo.App. W.D. 1998).) In an action for breach of a written contract, interest ordinarily accrues from the date of the breach or the time when payment was due under the contract. *Miller*, 67 S.W.3d at 624–25. A claim is not converted into an unliquidated claim by an unliquidated counterclaim, set-off, or recoupment. *Id.* Once the contract determined that interest was due, the amount of

principal and interest due becomes merely a matter of mathematical calculation. *Bydalek v. Brines*, 29 S.W.3d 848, 857 (Mo. App. S.D.2000).

■■ Here, the trial court determined that Respondents defaulted on the note obligation and that acceleration of the full balance of the promissory note together with interest was just and proper. The trial court awarded Appellant the principal balance of the note plus the interest requested by Appellant.[4] The trial court's judgment, however, did not occur until four months later and as a result additional interest accrued. Respondents do not contest the amount of the additional interest, only the acceleration and payment of any interest. We find that the trial court intended for the full amount of interest to be included in the award. Therefore, the judgment of the trial court on this issue is reversed and remanded with instructions to enter a judgment for the correct amount of interest due on the principal from the date of the trial until the date of the judgment.

Appellant also argues that the trial court failed to award interest on a second monetary claim against Respondents, specifically on the insurance refund check in the amount of $2,314 belonging to Appellant that Respondents received two years prior to trial. We affirm the trial court's decision not to award interest on the refund check.

The facts in the light most favorable to the judgment indicate that Respondents received a check for $2,314 as a refund from the insurance company and lacking any explanation concerning its purpose deposited the funds. It was later discovered that the check was actually a refund for

4. During trial, the principal balance under the note was stated as $168,650.20 and the

accrued interest at that point as $26,676.61.

Appellant and Respondents testified that they issued a check to reimburse Strope. John Cochran, one of Strope's personal friends, testified that he received the envelope and delivered it to Strope, however, Appellant testified that he never received the refund and brought a claim for conversion against Respondents for the amount of the refund plus interest.[5]

■■■ While Appellant may contend otherwise, this is an issue of credibility and we shall defer to the trial court's evaluation of the credibility of the witnesses and the weight of the evidence. *See State v. Rowland*, 73 S.W.3d 818, 821 (Mo.App. S.D.2002). Accordingly, we affirm the trial court's decision not to award interest on the refund check. Point III is granted insofar as the award of additional interest on the promissory note.

### Appeal Point IV—Wrongful Name Use

Appellant next contends the trial court erred in determining that Respondents did not wrongfully use Appellant's name. Appellant argues that the purchase agreement explicitly excluded its name from the purchase, but that Respondents nonetheless continued to conduct business under that name. We affirm the decision of the trial court that Respondents were not liable for conversion of Appellant's name.

■■■ Conversion is the unauthorized assumption of the right of ownership over another's personal property to the exclusion of the owner's rights. *Walker v.*

*Hanke*, 992 S.W.2d 925, 930 (Mo.App. W.D.1999). Conversion requires an intentional exercise of dominion or control over property that so seriously interferes with the owner's right of control that the interferer may justly be required to pay the owner the full value of the property. *Weicht v. Suburban Newspapers of Greater St. Louis, Inc.*, 32 S.W.3d 592, 597 (Mo.App. E.D.2000). Conversion can be proven by establishing: 1) a tortious taking; 2) any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to the true owner's rights; or 3) by a refusal to give up possession to the owner on demand, even though the defendant's original possession of the property was proper.[6] *Lacks v. R. Rowland & Co., Inc.*, 718 S.W.2d 513, 521 (Mo.App. E.D.1986).

■■■ Appellant alleged at trial that after Respondents took possession of the company, they endorsed Appellant's name on checks, claimed in a letter to have purchased Appellant's name, and incurred debt on a variety of accounts in Appellant's name. Conversely, Respondents contend that, save for the mistaken deposit of the insurance refund discussed in Point III, Respondents' use of the R.J.S. Security, Inc. name primarily involved mailings received from third-parties or for accounts that required Strope's personal authorization to change.[7]

The trial court found that Appellant "failed to produce credible evidence to es-

---

5. From what we can glean from the record, Respondents gave a replacement check to Appellant during trial for the full amount of the refund, but Appellant continued to seek the interest that accrued on the sum.

6. Conversion has also been found to require the following three elements:
(1) plaintiff was the owner of the property or entitled to its possession; (2) defendant took possession of the property with the intent to exercise some control over it; and (3) defendant thereby deprived plaintiff of the right to possession. *See JEP Enterprises, Inc. v. Wehrenberg, Inc.*, 42 S.W.3d 773, 776 (Mo.App. E.D.2001).

7. Ballard testified that Respondents attempted to contact Strope to have him make the necessary account adjustments, but Strope failed to return his calls.

tablish that [Respondents] have used R.J.S Security's business name" to support its claim. As indicated above, we defer to the trial court on factual issues and determinations of the credibility of the witnesses. *Reardon*, 77 S.W.3d at 760. We find that sufficient evidence exists to support the trial court's finding and, therefore, affirm the decision of the trial court. Point IV denied.

### Appeal Point V—Violation of Covenant Not to Compete

Appellant next alleges the trial court should not have awarded Respondents $100 in nominal damages as an offset against the promissory note for violating the Covenant Not to Compete. Appellant contends the agreement does not bar Appellant from working for another security company and that Missouri law does not enforce covenants restricting Appellant's contact with employees.

The parties entered into a Covenant Not to Compete in which Strope agreed to refrain from competing against Command Security, excepting work as a security guard under carefully proscribed conditions. The trial court found that after the transition period following the sale, Appellant started work for a competing security company, Land & Air Security.[8] While this in itself may not violate the terms of the agreement, the facts indicate that Strope acted beyond the capacity of a security guard and attempted to recruit former Command Security employee, Liebisch.

Appellant contends that Respondents cannot rely upon a covenant to restrict contacts with employees, citing *Schmersahl, Treloar & Co., P.C. v. McHugh*, 28 S.W.3d 345 (Mo.App. E.D.2000). In that case, an employee agreed to a covenant not to "[s]olicit, persuade, induce or encourage" other employees to terminate their employment for a period of three years after his termination, but he subsequently encouraged another employee to come work for his new employer. *Id.* at 347. That court found that an employer "may only 'fairly require' the protection of certain narrowly defined and well recognized interests against possible appropriation by a former employee . . . [including] trade secrets and customer contacts, the latter being essentially the influence an employee acquires over his employer's customers through personal contact." *Id.* at 349 (quoting *Continental Research Corp. v. Scholz*, 595 S.W.2d 396, 400 (Mo.App. E.D.1980).) We find the current situation distinguishable from that in *Schmersahl*, however, as that court specifically stated that such conduct "becomes culpable where it is done for a wrongful purpose, such as to destroy another's business, to misappropriate the employer's trade secrets, [or] to induce breach of a covenant not to compete." *Id.* at 351 (citations omitted).

■ Here, Strope solicited Liebisch to work for a competing security company. Such conduct was beyond the scope of acting as a mere security guard as proscribed in his covenant with Command Security and was culpable as the offer at-

---

8. The parties dispute whether Strope was ever actually employed by Land & Air Security. Appellant contends Strope did not work for Land & Air Security and, if so, he merely served as a security guard, which was an activity permitted under the Covenant Not to Compete. John Cochran, owner of Land & Air Security, testified that he only had five or six contacts with Strope since leaving Command Security, none of which related to the security business or hiring guards for Land & Air Security. However, deposition testimony from Liebisch read at trial indicated that Strope stated he had a new security firm (Land & Air Security) and desired to hire her.

tempted to induce Liebisch to breach her own covenant not to compete. Strope also owned the business which was sold to Command Security. The covenant not to compete presumably increased the value of the selling price of the business. The circumstances in *Schmersahl* contained none of these factors. We find that substantial evidence exists upon which the trial court could base its decision that Appellant violated his covenant not to compete. Point V is denied.

### Cross–Appeal Point I—Breach of Warranty

In Point I of Respondents' cross-appeal, Respondents contend the trial court should not have barred their counterclaim for breach of contract, as that theory of liability was not inconsistent with their counterclaim for fraud.

Respondents submitted two separate counts against Appellant. The first claim was based in fraud for the misrepresentation of the amount of the insurance premiums that would be incurred by the business. The second claim was based on a breach of the express representations and warranties contained in the Asset Purchase Agreement. The breach of warranties claim included the misrepresentation of the facts necessary to calculate the correct amount of the insurance premiums. The trial court entered judgment against Appellant on the fraud claim and awarded $35,000 in damages. The court also found that Appellant breached the express representations and warranties stated in the Asset Purchase Agreement, but barred the second claim on the grounds that it was based on the same theory of misrepresentation stated in Respondents' claim for fraud. Respondents claim they should

have been allowed to pursue and obtain judgment under multiple theories of liability and should not have been required to elect between those theories so long as they were not inconsistent.

It is true that a party may pursue multiple theories of liability, however, a party may not recover duplicative damages for the same wrong. While entitled to be made whole by one compensatory damage award, a party may not receive the windfall of a double recovery, which is a species of unjust enrichment and is governed by the same principles of preventive justice. *Inauen Packaging Equip. Corp. v. Integrated Indus. Serv.*, 970 S.W.2d 360, 368 (Mo.App. W.D.1998). Here, Respondents were allowed to present to the trier of fact claims for fraud and breach of warranty against Appellant, both of which relied upon the same wrong and the same item of damages—specifically, the misrepresentation regarding the insurance premiums and the resulting overpayment to Appellant as a result of that misrepresentation. The court awarded Respondents $35,000 in damages for that misrepresentation. As noted herein, the damages gave Respondents the benefit of their bargain.[9] Respondents received a $35,000 offset. The court did not err in allowing one recovery for the same wrong. Point I of Respondents' cross-appeal is denied.

### Cross–Appeal Point III—Acceleration and Interest on Promissory Note

Point III of Respondents' cross-appeal argues that Appellant first breached the purchase agreement and the acceleration of the note and interest was not proper. Respondents contend that it should not have to pay the accelerated note, or inter-

---

9. Respondents' arguments concerning the failure to award attorney's fees under the provision of the contract awarding attorney's fees is addressed in Point IV of their cross-appeal.

est that accrued since Appellant first breached the terms of the purchase agreement when it misrepresented the insurance premiums. Respondents argue that the "first to breach" rule permits Respondents to suspend performance under the note. *See Boten v. Brecklein,* 452 S.W.2d 86, 92 (Mo.1970), Respondents misapply the rule.

Missouri does adhere to the "first to breach" rule, which holds that a party to a contract cannot claim its benefit where he is the first to violate it. *Forms Mfg., Inc. v. Edwards,* 705 S.W.2d 67, 69 (Mo.App. E.D.1985). That determination of the first to breach does not end the analysis, however, as only a material breach may excuse the other party's performance. *Schaefer v. Rivers,* 965 S.W.2d 954, 958 (Mo.App. S.D.1998). Respondents' agreement to pay the promissory note was a promise. In cases involving breach of a promise, the proper remedy depends on whether the breach was material. See *Campbell v. Shaw,* 947 S.W.2d 128, 131 (Mo.App. W.D.1997). If the breach is not material, the aggrieved party may sue for partial breach but may not cancel. *Id.* at 131 (quoting *Curt Ogden Equip. Co. v. Murphy Leasing Co., Inc.,* 895 S.W.2d 604, 608–09 (Mo.App. E.D. 1995)).

The resolution of this issue, therefore, turns on whether Respondents' failure to maintain their monthly payments as set forth in the promissory note constituted a material breach. Here, the trial court found Appellant breached the express warranties in the contract by failing to disclose the material facts necessary to calculate the true amount of its insurance premium. While the trial court allowed Respondents to obtain remedies for that breach, it did not rule that Appellant materially breached the contract. Whether a breach is material or not is a question of fact. *Schaefer,* 965 S.W.2d at 958.

In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (2nd) Contracts § 241 (1979).

Respondents gambled when they refused to perform their obligations under the contract that the court would find the misrepresentations to be a material breach of the entire agreement and thus excusing Respondents' further performance.

Both in choosing to suspend and in electing to terminate, the injured party takes precipitous action at its own risk. According to one court, that party's decision 'is fraught with peril, for should such determination, as viewed by a later court in the calm of its contemplation, be unwarranted, the repudiator himself will have been guilty of material breach and himself have become the aggressor, not an innocent victim.'

Farnsworth, Contracts § 8.15 at 437 (2nd ed.1990).

There is substantial evidence supporting the implied finding that Appellant's breach was not material to the entire agreement. Respondents had a duty to continue paying on the promissory note and seeking damages for the partial breach.[10] To hold otherwise would allow Respondents much more than the benefit of their bargain even under their theory of damages. The cases cited by Respondents concern demands for future performance by the party in breach. Appellant had no further performance under the agreement. Appellant's alleged breach of the contract did not prevent the performance by Respondent of payment of the promissory note.

Respondents did not seek a rescission of the contract as Respondents have used and continue to use the business assets. Respondents successfully sought an alternative remedy as opposed to a complete rescission and were awarded damages as a remedy for misrepresentations. Substantial evidence supports the implicit finding of the trial court that Appellant did not materially breach the contract. We affirm the trial court's decision to accelerate the promissory note and award interest. Cross–Appeal Point III is denied.

## Cross–Appeal Point IV— Attorney's Fees

Respondents challenge the trial court's decision not to award them attorney's fees on their misrepresentation claim. Respondents claim that the Asset Purchase Agreement specifically provides for such an award in the event that damages result from misleading statements or representations by Appellant. Respondents' request for attorney's fees rests upon a provision in the Asset Purchase Agreement in which Appellant must indemnify and hold harmless Respondents against damages that result from inaccurate or misleading statements and representations.[11] Respondents contend the trial court found that Appellant violated this provision by engaging "a pattern of misrepresentation ... material to the negotiations" and also for failing "to disclose the material facts necessary to calculate the true amount of [Appellant's] insurance premiums." The trial court awarded damages under Re-

---

**10.** See *Restatement (2nd) Contracts* § 237 cmt. b, illus. 5 (1979) (If a breach is not material, the other parties' duties are not discharged, and refusing to perform is a breach.) *See also* Restatement (2nd) Contracts § 237 cmt. d (1979).

> (A typical example is that of the building contractor who claims from the owner payment of the unpaid balance under a construction contract. In such cases it is common to state the issue, not in terms of whether there has been an uncured material failure by the contractor, but in terms of whether there has been substantial performance by him. This manner of stating the issue does not change its substance, however, and the rule stated in this Section also applies to such cases. If there has been substantial although not full performance, the building contractor has a claim for the unpaid balance and the owner has a claim only for damages. If there has not been

> substantial performance, the building contractor has no claim for the unpaid balance, although he may have a claim in restitution (§ 374). The considerations in determining whether performance is substantial are those listed in § 241 for determining whether a failure is material.)

**11.** Asset Purchase Agreement, Article VI, Section 6.4 states:

> Seller and Shareholder jointly and severally agree to indemnify and hold harmless Buyer from and against any losses, damages, costs and expenses (including reasonable attorneys' fees) which may be suffered or incurred by Buyer arising from or by reason of the inaccuracy or misleading nature of any statement, representation or warranty of Seller made herein, including untrue statements of material facts or omissions to state material facts necessary to make the statements not misleading.

spondents' counterclaim for misrepresentation, but not for breach of the warranty in the contract, thus Respondents did not succeed under the warranty provision. The trial court made a finding that Respondents had failed to produce evidence to support their request for attorney's fees.

■ The court found that Appellant misrepresented material information sufficient to warrant a $35,000 offset against the amount of the promissory note. Neither party requested Findings of Fact and Conclusions of Law under Rule 73.01(a)[12], and as a result the trial court is deemed to have made its findings in accordance with the decree entered and its judgment will be affirmed under any reasonable theory supported by the evidence. *See In re Estate of Vickers*, 35 S.W.3d 851, 852 (Mo. App. S.D.2001). We defer to the judgment of the trial court on the amount of damages necessary to make Respondents whole. Point IV of Respondents' cross-appeal is denied.

### Cross–Appeal Point V— Implied Consent

In Point V of their cross-appeal, Respondents contend the trial court should not have entered judgment against Respondents Ballard and Danforth in their individual capacities regarding Appellant's claim for breach of the contract and of payment of the promissory note. Respondents claim that Appellant asserted no claim against either Ballard or Danforth in the initial petition and neither Ballard nor Danforth ever consented to the addition of any claim filed against them individually.

Appellant initially filed its first petition on February 17, 2000 against Command Security and Ballard. The court granted leave on March 14, 2000 for Appellant to amend the petition and Appellant added Danforth as a party. In that petition, Appellant alleged breach of the contract and the promissory note and requested relief only against "Defendants Command Security Services, Inc." The trial court, however, included Ballard and Danforth in the judgment on this claim due to their capacity as guarantors of the note. Appellant then filed and the trial court granted a motion to conform the pleadings to the evidence to include Ballard and Danforth as defendants on this issue.

Respondents cite Rule 55.33(b) in support of their claim that the trial court may only conform the pleadings to the evidence where issues not raised by the pleadings are tried by the express or implied consent of the parties. Respondents objected to the amendment of the pleadings because neither Ballard nor Danforth consented. We note that the full text of that rule states:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would cause prejudice in maintaining the

---

**12.** All rule references are to Supreme Court Rules (2002), unless otherwise indicated.

action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Rule 55.33(b).

A full reading of the rule indicates that a court may amend the pleadings regardless of whether consent is granted. Rather, "[a] trial court may freely allow the pleadings to be amended to conform to the evidence, without the consent of the non-moving party, if '... the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would cause prejudice in maintaining the action or defense upon the merits.'" *Pace Properties, Inc. v. American Mfrs. Mut. Ins. Co.,* 918 S.W.2d 883, 888 (Mo.App. E.D.1996) (quoting Rule 55.33(b)). We also note the appropriate level of deference we must grant to the trial court's determination on this issue. "A trial court should liberally permit amendments of pleadings to conform to the evidence presented." *Id.* We afford great discretion to the trial court on this issue, and will not disturb its decision on appeal absent an obvious and palpable abuse of discretion. *Id.*

We cannot find that the trial court abused its discretion in amending the pleadings to conform to the evidence. A reading of the pleadings reflects Appellant's intent that Ballard and Danforth be parties to this suit, and that Appellant sought damages on the note. Ballard and Danforth were specifically identified as Defendants in the Jurisdiction and Venue section of the petition, and both were referred to as such throughout Count I and elsewhere in the petition. Ballard and Danforth suffer no prejudice, as they serve as guarantors on the promissory note. Such evidence supports the trial court's determination that the merits of the case would be subserved by allowing the amendment and we find no abuse of discretion in the trial court's decision to do so. We therefore affirm the trial court's decision. Point V of the counterclaim is denied.

### Conclusion

We affirm the trial court's decision on all issues except for the award of interest on the promissory note between the date of the trial and the date of judgment. We reverse and remand to the trial court to enter a judgment with the additional interest that accrued on the promissory note in the four months between the trial and the date of the judgment.

All concur.

### OPINION ON MOTION FOR REHEARING OR TRANSFER

PER CURIAM.

Pursuant to Rules 84.17 and 83.02, Respondents request that we rehear this case or, in the alternative, transfer it to the Supreme Court of Missouri. In their "Motion for Rehearing or Alternatively for Transfer to the Missouri Supreme Court," Respondents argue in part that this Court was mistaken in its belief that neither party requested findings of fact and conclusions of law and that the trial court impliedly found a material breach of contract because it entered a judgment for fraud of which an essential element is that the representation be "material" to the fraud. We disagree with both contentions.

In our opinion we stated that neither Respondents nor Appellant requested findings of fact and conclusions of law pursuant to Rule 73.01 even though counsel for Respondents stated at the beginning of the trial:

The defendants would request, pursuant to Missouri Rule of Procedure 71.01(c)[1], that the Court make written findings as to controverted fact issues in its opinion when it decides this case. If the Court would prefer, we would be glad to submit at the conclusion of the evidence proposed findings of fact and conclusions of law that you could be look at.

■■■■■ It is the duty of the party requesting findings of fact and conclusions of law to identify the issues to be included. *In re Marriage of Colley*, 984 S.W.2d 163, 171 (Mo.App. S.D.1998). "The trial court must issue findings only on those controverted fact issues which have been specified by counsel." *Id.* A general request is not sufficient to require the trial court to make findings of fact on every issue in the case. *State ex rel. Nixon v. Russell*, 45 S.W.3d 487, 490 (Mo.App. W.D.2001). When only a general request for findings was made to the trial court, the appellate court may consider all evidence in the light most favorable to the judgment even if there is not a specific finding of fact on the issue. *Id.*

■■■■■ Respondents' counsel made a general request for findings of fact and conclusions of law. There were no specific requests for findings. Because the trial court did not make specific findings, the trial court is deemed to have made its findings in accordance with the decree entered and its judgment will be affirmed under any reasonable theory supported by the evidence. *See In re Estate of Vickers*, 35 S.W.3d 851, 852 (Mo.App. S.D.2001). For the reasons stated in our opinion, we defer to the trial court's decision on the denial of attorney's fees.

■■■■■ As to the issue of whether a "material" misrepresentation as used in a fraud claim is the same as a "material" breach in a breach of contract case, Respondents claim that a finding of a material misrepresentation in one provision of the contract necessitates a finding of a material breach of the total contract. Respondents do not cite to any cases for that proposition. We found no cases for that proposition either. As stated in our opinion, in cases involving a breach of promise, only a material breach excuses the other party's performance. *See Schaefer v. Rivers*, 965 S.W.2d 954, 958 (Mo.App. S.D. 1998). The contract at issue here involved the sale of a total business. The payment of insurance premiums was but one factor in the sale of the total assets. The fact that the court found a material misrepresentation in that one factor involving the cost of the insurance premiums is not determinative of whether the misrepresentation went to the essence of the total contract. By accelerating the promissory note, the trial court implicitly found that Respondents were not excused from the performance of their duty and, using the factors of § 241 of Restatement (2nd) Con-

---

1. Respondents contend the court reporter erroneously typed the rule as Rule 71.01(c) rather than Rule 73.01(c). Whether it was the court reporter's mistake or a misstatement by Respondent's counsel is irrelevant. The correct rule is 73.01(c) which provides in pertinent part:

 If a party so requests, the court shall dictate to the court reporter or prepare and file a brief opinion containing a statement of the grounds for its decision and the method of deciding any damages awarded.

 The court may, or if requested by a party shall, included in the opinion findings on the controverted fact issues specified by the party. Any request for an opinion or findings of fact shall be made on the record before the introduction of evidence at trial or at such later time as the court may allow.

 All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached.

tracts, the breach by Appellant was not a material breach of the total agreement.

Both motions are denied.